## DUGGAN v. DAVEY.

1. MINING PATENT—RIGHTS OF HOLDER WITHIN LINES OF CLAIM—BURDEN OF PROOF.

One holding a patent of the United States for a mining claim is entitled to challenge the right of any intruder within the lines of his claim, and to require him to justify such intrusion by proof of his proprietorship of a vein having its top or appex in another claim, and the pursuit of which in its downward course has brought him within the lines of the claim in controversy.

2. SURVEY OF ADJOINING MINING CLAIM—POWER OF EQUITY COURT TO MAKE ORDER PERMITTING.

In an equitable action to enjoin a threatened trespass upon a mining claim, the court has power to make an order permitting a survey of the drifts, tunnels and workings of an adjoining mining claim in possesion of defendants, when such defendants claim the right to enter plaintiff's lines in pursuit of a vein of ore having its appex within the lines of such adjoining claim. And such power is not abridged by the provisions of Secs. 645 and 646, Civil Code, nor by Sec. 19, Chap. 31, Pol. Code, relating to surveys of mining and other property in controversy.

3. REVIEW OF FACTS IN LOCATING THE TOP OR APPEX OF VEIN OF ORE.

Filed February 9, 1886.

A very full statement of facts appears in the opinion of the court.

*McLaughlin & Steele,* for defendants, who appeal.

It has been the settled policy of the government to promote the development of the mining resources of the country. Haydenfeldt v. Daney Gold, & Co., 3 Otto 640; Jennison v. Kirk, 8 Otto 457.

The intention of the legislature when ascertained must control, even when necessary to enlarge, restrict or qualify the

meaning of words used.    Eureka  Richmond Case, 4 Sawyer, 316; Haydenfeldt v. Daven Gold, & Co., 3 Otto, 638.

A relocation certificate depends for its vitality on the original location; that, upon a valid discovery of a vein or lode of quartz or other rock in place bearing valuable mineral in the unappropriated public lands of the United States, by a citizen or one who has declared his intention to become such, the posting of a location notice at the point of discovery, sinking of a discovery shaft, marking of the boundaries of a claim, and the filing for record of a location certificate in the proper office.

See Sections 13 and 16 of Chapter 31, Codes of Dakota, relating to mines and mining, page 161, as to when an "amended certificate" of location, and a "relocation certificate" can be made and filed, and what each one must contain. Sullival *et al.* v. Hense *et al.* 2 Colo. 431; Strepey *et al.* v. Stark *et al.*, 7 Col. 614; Van Zandt v. Argentine Mining Co. 2 McCrary (8 U. S. Cir.) 159; Upton v. Larkin, 6 Pac. Rep. No. 2, p. 66, March 19, 1885, Sup. Court Montana.

The only purpose for which this certificate could be offered was to show that plaintiffs or their grantors, had by acts obtained a right to the possession, prior to the title by patent, and that by relation the patent took effect as of the date of such acts.    The effect of the ruling of the court is:  That a party may, by his own declarations, relate back his title, without proof of any of the acts, upon the performance of which only, could he obtain rights upon which the patent could operate by relation.

Records made by applicants for patent in the United States land office are purely *ex parte,* and in no wise competent proof of the issues involved in a suit involving title to a mining claim.

They would deprive the opposing party, as in this case, of his right of cross examination, and of testing the truthfulness of the other's declarations, in his own favor in the land office. Bay State Silver Mining Co. v. Brown, U. S. District Court, State of Nevada, 21 Fed. Rep. 169, No. 3, Sept. 9, 1884.

It was possible and convenient for the plaintiffs to have

shown by some evidence (if the fact were true) that the defendants were not within the "exception" in the patent, were not the proprietors of the vein, lode, ledge or deposit on which they were working beneath the surface of the Silver Terra, but were in fact tresspassers.   3 Washburn on Real Property, 431; Stockbridge Iron Co v. Hudson, 107 Mass. 321, 11 Brown 321; Corning v. Troy Iron Works, 40 N. Y. 209; Bridger v. Pierson, 45 N. Y. 601-3; West Point Co. v. Reymert, 45 N. Y. 707; Bowen v. Connor, 6 Cushing, 132; Dennis v. Wilson, 107 Mass. 591; Munn v. Warrell, 53 N. Y. 44; Whittaker v, Brown, 46 Penn. St. 197; Marvin v. Brewster, 55 N. Y. 538; Sloan *et al.* v. The Lawrence Furnace, 29 Ohio St. 568; Rychman v. Gillis, 57 N. Y, 68; Hudson Co. v. Stockbridge, 11 Brown 290, 107 Mass. 290.

To maintain an action of ejectment for a mining claim, the plaintiff must establish that he is in possession, and that a vein or lode has been discovered on the claim prior to the commencement of the action, and that it extends to the ground for which he sues.

The burden is on the plaintiff to establish the fact that ore was discovered in his discovery shaft and that the same is continuous to the ground in controversy.   Zollars v. Evans, 2 McCrary, 39; Van Zandt v. Argentine Mining Co. 2 McCrary 159.

The burden of proof was upon the plaintiffs to show ownership of the vein at the point where the alleged trespass was committed.   Zollars v. Evans, 2 McCrary, 41; Van Zandt v. Argentine Mg. Co. 2 Id. 163; Leadville Mg. Co. v. Fitzgerald, 4 Morrison Mining Reports, 380; Jupiter Mg. Co. v. Bodie Mg. Co. 11 Fed. Rep. 669-672.

The patent from the United States is not conclusive that the Silver Terra lode mentioned therein is a vein or lode within in the meaning of the statutes, bearing valuable minerals or extends to the ground in controversy.   Stephens v. Williams, 1 McCreary 480; Leadville Mining Co. v. Fitzgerald *et al.* and Stevens & Litter v. Murphy *et al.* 4 Morrison Mining Reports, 380.

*Van Cise & Wilson*, for respondents.

It was contended by the defendant's counsel that before plaintiffs could recover, they must first show the acts constituting a valid location of the Silver Terra, to-wit: discovery of a vein, lode or ledge, sinking a discovery shaft, posting a notice, fixing boundary stakes, recording certificate, etc., and that they had within the limits of their claim the apex of the ore body upon which they sought to enjoin the defendants from trespassing upon. In the absence of a patent all this would have been necessary had the plaintiffs been seeking to enjoin the defendants from trespassing on an ore body outside of plaintiff's lines; but this is an action to protect and preserve the property within the limits of plaintiff's actual possession, and of which they were in possession prior to the trespass of the defendants. In such case the proof of possession alone would be enough to cast the burden on defendants, either in an action of ejectment or an action brought, as this, to restrain a trespass. This doctrine is so well established that the citation of a few cases to support it will be sufficient: English v. Johnson, 17 Cal. 108; Golden Fleece Co. v. Cable Con. Co. 12 Nev. 321; Sears v. Taylor, 4 Colo. 38; Crossman v. Pendery, 8 Fed. Rep. 693; Harris v. Equator M. & Sm. Co., Copp's M. L. 420; North Noonday M. Co. v. Orient M. Co., 6 Saw. 507; Burt v. Panjaud, 9 Otto 180; Campbell v. Rankin, 9 Otto 281; Trenouth v. San Francisco, 10 Otto 251; Field et al. v. Gray et al. 9 Copp's L. O. 157; U. S. Revised Statutes, Section 910.

But in this case plaintiffs proved title by patent from the government. The grant itself is evidence that every prerequisite to its issuance has been duly performed. Abbott v. Prineaux, 16 Nev. 361; French v. Fyan, 103 U. S. 169; Smelting Co. v. Kemp, 104 U. S. 636; Steele v. Smelting Co., 106 U. S. 447; Hawke v. Deffebach, 4 Dak. 20.

In the case of patents for mineral claims, the rule is that the patent relates to the location. Kahn v. Old Tel. Min. Co., 2 Utah 174, 185, 198; Eureka Case, 4 Saw. 302, 317; Heydenfeldt v. Daney G. & S. M. Co., 103 U. S. 634; Kimball v. Gearhart, 12 Cal. 28.

v.4DAK.—8

A "mining claim" is a parcel of land containing precious metals in its soil or rock. Smelting Co. v. Kemp, 104 U. S. 649; Hawke v. Deffebach, 4 Dak. 20, 22 N. W. Rep. 487; Gleason v. Martin White Co., 13 Nev. 458; Wolfley v. Lebanon Min. Co., 4 Colo. 114; McCormack v. Varnes, 2 Utah, 362; Iron Silver Min. Co. v. Cheeseman, 8 Fed. Rep. 300; Forbes v. Gracey, 94 U. S. 767; Pacific Coast M. & M. Co. v. Spargo, 8 Saw. 645; Cowell v. Lammers, 21 Fed. Rep. 200.

In mining cases courts of equity, when once convinced of the propriety of so doing, will compel an inspection and survey of the works of the parties, and admittance thereto by means of the appliances in use at the mine. This will be done when the facts by which the controversy must be determined cannot be discovered, except by an inspection of the works in the possession of defendants, accessible only by shafts and machinery operated near the mine. Before granting an order of this kind, the court must be satisfied that the application is made in good faith, and, in granting it, will pay due regard to the convenience of the party affected. Thornburgh v. Sav. Min. Co., 1 Pac. Law Mag. 267 (U. S. Cir. Ct. Nev.); Bennitt v. Whitehouse, 28 Beav. 119, 29 L. J. Ch. 326; Ennor v. Barwell, 1 De G. F. & J. 629; Bennett v. Griffiths, 30 L. J. Q. B. 98, 7 Jur. N. S. 284; Att'y General v. Chambers, 12 Beav. 159; Blakesley v. Whieldon, 11 L. J. N. S. Ch., 164; Whalen v. Branker, 10 Law Times, N. S. 155; Stockbridge Iron Co. v. Cone Iron Works, 102 Mass. 80; Thompson Iron Co. v. Allentown Min. Co., 28 N. J. Eq. 77.

CHURCH, J. This was an action in equity, brought by the plaintiffs, as owners of the Silver Terra mine, to restrain the defendants from prosecuting certain mining operations, by which it was alleged they had already approached, and were threatening and intending to enter within, the lines of the plaintiffs' claim, and remove certain valuable bodies or deposits of silver ore therefrom. The complaint alleged ownership by the plaintiffs in fee of the Silver Terra mine, (mineral claim lot No. 364,) and described the same by metes and bounds. It also stated sufficient grounds for equitable relief by way of in-

junction, and prayed (1) for the usual injunction *yen dente lite;* (2) for perpetual injunction at the final hearing; (3) for general relief. A preliminary injunction was granted, and, upon a motion to dissolve, was continued in force.

The answer of the defendants, after denying "each and every allegation of the complaint, except as hereinafter specifically admitted," proceeded to allege with great particularity of detail their ownership and possession of a certain quartz mining claim known as the "Sitting Bull" lode, with all veins, lodes, or ledges of valuable mineral bearing rock in place, throughout their entire depth, having their top or apex within the exterior surface boundaries of said Sitting Bull lode or mining location, under a location made by Donegan and Cochran, grantors of defendants, September 26, 1876; a relocation by Donegan and Cochran, March 16, 1877; an entry for patent by John H. Davy, January 8, 1883; and continuous and uninterrupted possession by defendants and their grantors. The answer further alleged that the discovery on the Sitting Bull lode was made on a vein, lode, or ledge of rock in place, bearing silver; that the top or apex thereof was within the surface lines of said claim, extended downward vertically; that said claim was located along the said vein or lode; that defendants, in working and developing the same, had followed it for a distance of about 600 feet from the top or apex thereof, on a departure from the perpendicular, through and beyond the verticle southerly side line of the Sitting Bull claim, and in so working, developing, and following the same had reached a point on said vein or lode where the same reached or passed through and beyond the vertical northerly side line of the Silver Terra claim; that throughout its entire course, as so worked, developed, and followed by them, the ore body contained in said vein was continuous, without break or interruption, and that the vein, lode, or ledge bearing silver, upon which they (the defendants) were working, as alleged in the complaint, and which is claimed to be the property of the plaintiffs by virtue of their Silver Terra mining claim, is the same vein, lode, or ledge so discovered, worked, developed, and followed

by the defendants in and from their said Sitting Bull location; that the said vein at the point where they were working the same, as alleged in the complaint, lies between vertical planes drawn downward through the end lines of said Sitting Bull location, continued in their own direction; that the defendants are the owners of said vein, in possession and entitled to the possession thereof at said point, and at all points within the Silver Terra claim; that they have the right to follow the same so long as it shall continue to be continuous, and to depart from the perpendicular, and that as such owners they are following the same, and claim the right to do so, within the vertical side lines of the Silver Terra claim, and through and across the same; and that plaintiffs have no right, title, or interest in or to said vein, or any portion thereof, by virtue of their ownership of the Silver Terra claim.

At the time the complaint was filed plaintiffs had entered the Silver Terra for patent. Subsequently a patent was issued to them therefor, and thereafter, by leave of the court, they filed a supplemental complaint, alleging—*First.* The issue of said patent, and that it was based upon a location made by Daniel Egan, April 1, 1881, and claiming relation of title and possession to that date. *Second.* Alleging that defendants were prosecuting their workings under a claim of right so to do as the proprietors of a vein having its top or apex within the Sitting Bull claim, and that said claim and pretense were false, fictitious, and fraudulent, and defendants without right to enter and commit the acts complained of, and that plaintiffs were ignorant of this claim at the time their original complaint was made. Wherefore they prayed that the defendants might be restrained from setting up or asserting any right, title, or interest in or to their said mining ground, or the ores, metals, or minerals contained therein, on account of said alleged vein in said Sitting Bull claim.

For answer to this supplemental complaint the defendants, among other things, denied any knowledge or information as to the issuing of the patent to the plaintiffs; denied that said patent was based upon a location made by Egan, April 1, 1881,

or any other time; and alleged that Egan never, at any time, made any valid location of said Silver Terra claim, or any discovery thereon of any vein of quartz or other rock in place, containing valuable mineral; and that the pretenses of Egan and the plaintiffs in this behalf are fraudulent and unfounded. They further reassert, but in more general terms than in their previous answer, their right to prosecute the work of extracting and mining the ore complained of by plaintiffs by virtue of their proprietorship of a vein having its top or apex outside of the lines of that claim, and extending thence on a departure from the perpendicular, in its downward course, to the place where they were working, within the vertical boundaries of the Silver Terra. This answer also avers that the plaintiffs have no right, title, or interest in said vein, lode, or ledge by patent from the United States, or otherwise, nor any right to the ores contained therein; and prays that it may be adjudged that the defendants are the proprietors of the vein upon which they were working at the commencement of the action herein, and that plaintiffs have no estate, right, title, or interest in or to the same.

The issues presented by these pleadings were tried by the court, without a jury. Fifty-six working days were occupied in the trial, during the course of which 35 witnesses were examined for the plaintiffs and 60 for the defendants, the testimony altogether covering some 7,000 pages. Once during the progress of the trial, and again after the testimony was closed, the presiding judge visited and made a thorough inspection and examination of the premises in controversy, in company with a representation selected by each party. Subsequently the court filed its findings of fact and conclusions of law, adjudging the plaintiffs entitled to the relief demanded, and a final decree was entered in accordance therewith. A motion for a new trial was made and denied, and an appeal was therefrom taken to this court. The record shows 100 assignments of error, which it will be impossible for us to consider in detail. We shall notice only some of the more important involved in the appeal.

Several of these assignments relate to the admission or exclusion of evidence concerning the location of the Silver Terra mining claim. So far as these alleged errors involve, or are involved in, the question of the priority in point of time of such rights as were acquired by the plaintiffs and defendants, under or by virtue of their respective locations, and the subsequent entry thereof, they would seem to have been disposed of by the findings of the court which awarded such priority to the Sitting Bull location, and the rights acquired thereunder. So far as such alleged errors have been urged as affecting the validity of the Silver Terra claim, they are disposed of by the entry and patent of that claim to the plaintiffs, as will hereafter appear.

Another class of these assignments relates to the alleged errors in the findings of fact. Concerning these it is only necessary for us to repeat the rule, so well settled in this court, that when there is a substantial conflict in the testimony, the findings of the trial court will not be disturbed. What was said by the court in Caulfield v. Bogle, 2 Dak. 466. S. C. 11 N. W. Rep. 511, is especially applicable to this case, in which nearly 100 witnesses were examined, and where the trial judge had the advantage of a personal examination of the ground in controversy.

Another ground of error assigned is in the refusal of the court to grant the defendants' motion for a nonsuit at the close of the plaintiffs' case. A reference to the complaint and supplemental complaint, as above set forth, will show that the principal averments upon which the plaintiffs' case was founded were (1) title to the premises in controversy in fee, by patent from the United States; (2) a threatened trespass by the defendants of a character irremediable at law; (3) a claim of right by the defendants to do the acts complained of.

Primarily, of course, it must be conceded that the burden would be upon the plaintiff to establish the truth of all these averments. As a matter of fact the only evidence offered by the plaintiffs in their principal case in support of their first averment was the patent of the United States, granting to them in the usual form the Silver Terra lode claim, with some other

evidence, not necessary to be considered here, as to the date of the location upon which the entry and patent were based; while to sustain the other averments they relied upon alleged admissions in the answers.

The motion to nonsuit was based upon the contention (1) that a patent for a quartz mining claim affords no evidence of title to any ore body except such as may be shown to belong to a vein, lode or ledge upon which a valid discovery and location have been made, which discovery and location have, in due course of compliance with the laws regulating the disposal of the mineral lands by the United States, ripen into the patent, and to such other veins as may be found to have their tops or apexes within the lines of the patented claim; and that, on the other hand, there is an express reservation and exception out of the grant contained in such patents of the right of the proprietor of any other vein or lode having its top or apex outside the exterior limits of the claim patented to enter the same (the surface excepted) for the purpose of extracting and mining the ore from such vein, etc.; (2) that the answers contain no admissions of which the plaintiffs were entitled to avail themselves sufficient to support the second and third averments as above set forth.

The first point involves a construction of some of the leading provisions of the Revised Statutes of the United States relating to the occupation and purchase of the public mineral lands, especially Section 2322, which is as follows: "The locators of all mining locations heretofore made, or which shall hereafter be made, on any mineral vein, lode or ledge situated on the public domain, their heirs and assigns * * * so long as they comply with the laws of the United States, and with the state, territorial and local regulations not in conflict with the laws of the United States governing their possessory title, shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes or ledges throughout their entire depth, the top or apex of which lies inside of such surface lines, extended downward vertically, although such veins, lodes or ledges may

so far depart from a perpendicular in their course downward as to extend outside of the vertical side lines of such surface locations. But their right of possession to such outside parts of such veins or lodes shall be confined to such portions thereof as lie between vertical plains drawn downwards, as above described, through the end lines of their locations, so continued in their own direction that such plains will intersect such exterior parts of such veins or ledges; and nothing in this section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another.''·

It will be observed that there is no controversy respecting the surface of the Silver Terra claim; of that the plaintiffs are in unquestioned possession, and it is unquestionably embraced within their patent. The ore body in controversy is some hundreds of feet below the surface, and has been reached by a tunnel upwards of 600 feet long. Nor are they asserting a right to anything beyond or outside of that segment of the earth which would be included within planes extended vertically downward through the lines of their claim. They are merely resisting an encroachment upon mineral deposits within that segment. Let us consider, therefore, the nature and incidents of the title acquired by possession, location and patent of mineral lands.

The common-law rule is familiar. The ownership and possession of the soil extended to the center of the earth, and *usque ad cœlum*, and included everything upon its surface and within its bosom. We find that the thing, the substance of which the United States statute treats, is "lands valuable for minerals," and that it is for the disposition of these "lands" that provision is made in Chapter 6 of the Revised Statutes. It is the "lands" in which mineral deposits are found which are "open to purchase." It is "land" claimed and located for valuable mineral deposits, which is the subject of application for patent, and where patent of the United States issues, it is for the "land" at so much per acre. The definition of

"land" given in our territorial statute is concise: "The solid material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock or other substance." In the absence of anything in the statute to the contrary, we think it might well be concluded that one becoming the owner or possessor of any of these lands would hold them with and subject to all the incidents of ownership and possession at common law. It should be borne in mind that before the enactment of any statute recognizing and regulating his possessory rights, the mining locator, as between himself and the United States, was technically a mere trespasser upon the public domain; and that even although he might have conformed in his location to the rules and customs adopted in the mining district in which his claim was situated, yet, so far as any legal right existed to hold his claim against a new-comer, that right rested upon possession merely; hence the statute. Rev. Stat. U. S. § 910.

The government, however, having in pursuance of its policy of encouraging the discovery and development of its mineral wealth, long tacitly recognized the possession of the miner, has now, by statute, not only given an express license to those establishing their possession in the prescribed method, and provided a way by which the locator may become the owner in fee of the land embraced within the lines of his claim, but has also declared that such locators "shall have the exclusive possession and enjoyment of all the surface included within the lines of their location, and of all veins, lodes and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines extended downward vertically, although such veins, lodes or ledges may so far depart from a perpendicular in their course downward as to extend outside of the vertical side lines of such surface locations." This statute undoubtedly introduced an important modification of the common-law rule. It gives to the proprietor of a vein a right unknown to the common law,—the right to pursue such vein beyond his own lines, outside of that particular segment of the earth embraced within the lines of his claim extended vertically downward, and

it is therefore to that extent, an enlargement of his common-law right. But, on the other hand, inasmuch as the same right is granted to every locator under the statute, each holds his possession subject to the same right in others, and is therefore liable to have his land entered by any adjoining proprietor pursuing his vein in its course beyond his own side lines; and to this extent, therefore, his common-law possession is abridged.

Two points cannot fail to be noticed in this connection: First, that this enlargement of the common law possessory right is incident only to a claim located in the manner provided by law; and, second, that the exercise of such right operates to ,the abridgement of the possession of every tenement penetrated or intersected by a vein having its top or apex in a superior tenement.

Such I understand to be the effects of the statute. I am unable to see that any other particular essential to this controversy the rights of possessors of mineral lands differ from those of other lands. Says Justice HALLETT, in the case of Leadville Min. Co. v. Fitzgerald, 4 Mer. Min. Rep. 385: "Within the lines of each location the owner shall be regarded as having full right to all that may be found, until some one can show a clear title to it as a part of some lode or vein having its top or apex in other territory. In other words, we may say that there is a presumption of ownership in every locator as to the territory covered by his location, and within his own lines he shall be regarded as the owner of all valuable deposits, until some one shall show by preponderance of testimony that such deposit belong to another lode having its top or apex elsewhere." And in the case of Colorado Central v. Equator Min. Co., the same learned judge remarks: "Generally, it may be said that a patent for a lode will convey all valuable deposits within the tract described, except such as may belong to lodes and veins which outcrop elsewhere, and come into the tract in their downward course. *Prima facie* the patentee must be the owner of all that lies within his lines. * * * Every owner by patent shall be sovereign in his own domain, and when he goes beyond that he shall recognize the equal rights of others

to the same protection." The United States supreme court, in Forbes v. Gracey, 94 U. S. 767, says that the patentee, "obtains the government title to the entire land, soil, mineral, and all," and declares that the only distinction between the patentee and the locator is in the ownership of the fee. See, also, McCormick v. Varnes, 2 Utah; 362; Wolfley v. Lebanon Min. Co., 4 Colo. 114; Pacific C. Min. & M. Co. v. Spargo, 8 Sawy. 645; S. C. 16 Fed. Rep. 348. That actual possession is good and sufficient evidence of title, as against a mere intruder, is established by numerous well-considered cases. I cite a few only: Grover v. Hawley, 5 Cal. 425; English v. Johnson, 17 Cal. 108; Crossman v. Pendery, 8 Fed. Rep. 693; North Noonday Min. Co. v. Orient Min. Co., (on motion for new trial) 6 Sawy. 507; S. C. 11 Fed. Rep. 125; Golden Fleece Case, 12 Nev. 321; Burt v. Panjaud, 99 U. S. 180; Campbell v. Rankin, Id. 261; Trenouth v. San Francisco, 100 U. S. 251; Rev. St. U. S. § 910.

It would seem, therefore, that one holding a mining claim by mere possession, while on the one hand not receiving that enlarged right incident to a valid mining location, and on the other hand being subject to intrusion by the lawful proprietor of any vein which may be found in its course downward to penetrate or intersect his claim, holds his claim in other respects with and subject to the incidents of possession at common-law; and may defend his possession of the surface, and of that segment of the earth included within his surface lines extending vertically downward, with all that it contains, against every one not claiming under superior title. A *fortiori*, therefore, is one holding the patent of the United States for a mining claim entitled to challenge the right of any intruder within the lines of his claim, and to require him to justify such intrusion by proprietorship of a vein having its top or apex in some other claim, and the pursuit of which in its downward course has brought him to the ground in controversy. Undoubtedly, were the plaintiffs seeking to enforce a similar extralateral right, they would be compelled to prove that the defendant so urgently insisted upon his motion that they must prove, viz: all the incidents of a valid mining location under the laws regulating

the same, and that the ore body in controversy was part of a vein of which, by virtue of such location, they had become proprietors; but, as we have already seen, such is not the position of the plaintiffs, while on the other hand it is precisely the position occupied by the defendants, and it is just this which renders the doctrine of many of the cases cited by the defendant, as, for instance, Sterns v. Williams, 1 McCrary, 480; Tollars v. Evans, 2 McCrary, 39; S. C. 5 Fed. Rep. 172, Van Zandt v. Argentine Min. Co., 2 McCrary, 159; S. C. 8 Fed. Rep. 725; Jupiter Min. Co. v. Brodie Min. Co., 11 Fed. Rep. 669; see, also Stearns v. Gild, 1 Morr. Min. 581,—inapplicable to the case of the plaintiffs, while entirely pertinent to the case of the defendants.

For the purposes of the plaintiffs' case mere possession was sufficient; but they have produced their patent, which, as we have before remarked in the case of Hawke v. Deffebach, 22 N. W, Rep. 481, announcing the law as laid down in the cases there cited, "it is evidence of a perfected right, established by the final adjudication of the tribunal erected for the especial purpose, and carries with it the presumption that every requisite prescribed by law for the acquisition of title has been performed." The failure of the learned counsel for the dafendants to recognize the distinction thus pointed out, and their persistence in the contrary theory, seems to have largely colored the whole case, and to lie at the foundation of many of their assignments of error.

But it is further insisted that the patent itself contains certain exceptions and reservations which support the contention of the defendants. We do not deem it necessary to make any critical analysis of this patent. An examination of it does not disclose any clause which is, in terms, an exception or reservation. In the first place, there is a grant, and that grant is of the mining premises described, together with the statutory rights defined in Section 2322, above quoted. Then comes, in the *habendum* clause, at the close, these words: "Subject to the following conditions and stipulations: First, that the grant hereby made is restricted to the land hereinbefore described as

lot No. 364, with 1,496 lineal feet of the Silver Terra," etc.,
"through its entire depth, as aforesaid, together with all the
veins, lodes, ledges, or deposits, through their entire depth, the
tops or apexes of which lie inside the exterior lines of
such survey." Now, that is the restriction in the deed.
What is the extent of that restriction? Is it a restriction
upon the common-law grant? We do not understand
it so at all, but we think that it is a restriction upon
the grant of the right to pursue any of these veins out-
side of the lines of location. The right is restricted to
the length of those veins within the limits of the claim, so
that one cannot pursue them beyond that section of the vein
which is included within the end lines of the claim produced.
That seems to be the restriction, and, construing this grant
with the statutes, that seems to be the plain and reasonable in-
tendment of the grant. As before stated, the common-law
right exists to the land and all that it contains, subject only to
this abridgment which is contained in the second clause of the
conditions expressed in this deed, viz: "Second, that the prem-
ises hereby conveyed, with the exception of the surface, may
be entered by the proprietor of any other vein, lode, ledge, or
deposit, the top or apex of which lies outside the exterior limits
of said survey, should the same in its downward course be
found to penetrate, intersect, extend into, or underlie the prem-
ises hereby granted, for the purpose of extracting and remov-
ing the ore from such other vein, lode, ledge or deposit." The
whole instrument seems to accord with the statute, and to be
framed upon a construction of the law essentially the same as
we have above given.

As to the other grounds presented in support of the mo-
tion for nonsuit, it seems sufficient to say that we think the
answers clearly contain, not merely admissions, but affirmative
averments of all the other facts necessary to make out a *prima
facie* case for the plaintiffs. The general denial is of every
allegation of the complaint "not hereinafter specifically ad-
mitted." This word "hereinafter" embraces all that follows,
and authorized the plaintiffs to avail themselves of any admis-

sions therein contained, thus obviating the necessity of any
further proof as to the facts so admitted. It may be well, how-
ever, to add particularly that we think the irremediable char-
acter of the injury threatened sufficiently appears from the
averments of the answer that the property in controversy is
valuable silver-bearing rock, which defendants propose to re-
move by the ordinary process of mining. We find no error in
denial of this motion.

Another error assigned consisted in the making of an or-
der permitting an inspection and survey by the plaintiffs of the
ground in controversy, and also of the drifts and tun-
nels by which it had been reached by defendants, and, in
fact, all the workings of the mine. This order was made
after the close of defendants' case, in the course of which
they had examined some 60 witnesses brought in from day
to day as the exigencies of the case seemed to them to re-
quire, all of whom, of course, had full opportunity to make
thorough and repeated inspections and surveys, unembarrassed
by any surveillance on the part of the plaintiffs, the whole
mine being in defendants' exclusive possession. It was ur-
gently insisted on behalf of the defendants, who thus persisted
in the erroneous theory of the case to which we have before
referred, that it was incumbent upon the plaintiffs to make out
their case in the first instance by proving their independent
title to the specific ore body in controversy as belonging to a
vein, lode, or ledge of which they were the proprietors, and
that they could not wait until defendants had introduced their
proof before preparing their evidence; and, further, that the
court had no right to authorize plaintiffs to enter upon undis-
puted ground of the defendants for the purposes of inspection
and survey. It was further insisted that the statutes pre-
scribed the only method for obtaining such survey, and that
the statutes prescribed the only method for obtaining such sur-
vey, and that the statute was not followed in this application.

The first ground of opposition to this order has already
been disposed of. As to the objection that the statute provided
the proper relief, the court below held that Sections 645 and

646 of the Code of Civil Procedure were designed to provide for common law actions, and that neither these, nor Section 19 of Chapter 31 of the Political Code were to be regarded as abridging the chancery powers of the court in cases calling for their exercise. This view we think was correct.

In the present case the existence or non-existence of a vein, its extent, direction, inclination, continuity, and all the physical conditions upon which the rights of the parties depended, could only be determined by minute, careful, and thorough inspection and survey, directed to the precise points elicited by the progress of the trial. The court below said: ''The position of the defendants is somewhat remarkable. I cannot account for it. They resist this application, not upon the ground it is unjust for the court to make it, not on the ground the defendants are going to suffer any injury, but almost simply and wholly upon the ground the court has not the power to make it. They do not show, or attempt to show, the court that the defendants are going to be injured in any way, shape, or manner, except the insinuation that the plaintiffs might go in with their witnesses and manufacture testimony. They certainly cannot change the physical facts. If there is danger of the plaintiffs going in there and manufacturing testimony, it seems to me it would be dangerous on the part of defendants to have unlimited opportunity; if there is any testimony to be manufactured, it would seem that the party who has the most opportunity to manufacture testimony would be the most liable to do that. So far as that is concerned, I do not think it necessary to impute to either side the desire to manufacture testimony. There is a large number of physical conditions here concerning which witnesses have expressed their opinion, which must be regarded to some extent as matters of opinion, although to some extent, also, as questions of fact. I cannot see upon what theory of equity or good conscience the plaintiffs ought to be excluded from a reasonable opportunity to meet the case which the defendants have now made. They had all the opportunity they desired to make just such a case as they thought themselves entitled to make, or necessary to make,

to support their pleadings, and I think the plaintiffs ought to be afforded a fair opportunity to meet their case. In a case like this, where the defendants rest their right to the property upon the existence of a vein having its origin in the lines of another claim of theirs which is not itself in controversy, they thereby, it seems to me, make that an instrument of evidence; they bring it into court, as it were, and they submit it to the inspection of the court. They submit the facts concerning it, and they cannot be permitted to say: 'We will submit it to the court to just the extent we wish to submit it; we will produce just such witnesses as we desire to produce; we will examine them as to just such facts as we choose to examine them upon; we will produce just such evidence concerning it as we choose to produce; and then we will shut the door and lock it.' That cannot be permitted, certainly. They submit it to the court as an instrument of evidence, and they invite scrutiny of it in all its branches, extent, and scope; and it seems to me clear that the plaintiff ought to have a fair opportunity to examine it with his witnesses, and meet the case made by the defendants."

We concur in the views thus expressed, and it is apparent upon an inspection of the order made by the court that the privileges granted were restricted within reasonable limits, and the rights of defendants carefully guarded. The general powers of a court of equity in such cases will be found to be recognized and affirmed in the following authorities: Thornberg v. Sav. Min. Co., 1 Pac. Law Mag. 267; Bennett v. Whitehouse, 28 Beav. 119; Ennor v. Barwell, 1 De Gex., F. & J. 629; Bennett v. Griffiths, 30 L. J. Q. B. 98; S. C. 7 Jur. (N. S.) 284; Attorney General v. Chambers, 12 Beav. 159; Blakely v. Wheldon, 1 Hare Ch. 176; Stockbridge Iron Co. v. Cone Iron Works, 102 Mass. 80; Thomas Iron Co. v. Allentown Min. Co. 28 N. J. Eq. 77.

This brings us to the consideration of the main controversy, the consideration of which will dispose of such of the remaining assignments of error as we think essential. We have already stated that we do not feel called upon in this case to review the findings of fact made by the court below. We

shall adopt them as they are.   In connection with these find-
ings, and the conclusions of law thereupon, the court also de-
livered a carefully prepared opinion in writing, which has been
sent up with the record to this court; and inasmuch as it states
in convenient form the facts and circumstances of the case, and
the conclusions to which they lead, and as we agree with those
conclusions, we shall adopt that opinion also, or so much of it
as is hereinafter quoted, as the basis for our own judgment.

After disposing of some preliminary matters, the district
court proceeds as follows:   ''Coming now to the main questions
in the case, which involve the existence, situation, and charac-
ter of the alleged vein or lode of mineral-bearing rock, the lo-
cation of defendants' Sitting Bull claim with reference thereto,
it is difficult to convey a correct comprehension of the prem-
ises without the aid of one or more diagrams, but I will attempt
a description which may suffice for the present purpose.   Cus-
ter hill, upon which these claims are located, is situated in the
village of Galena, in Bare Butte mining district, in this county.
The village lies at the base of the western slope of the hill,
which presents a lateral face from south to north (taken along
the line of the outcrop hereafter mentioned) of 1,300 feet,—of
course at the base it is somewhat wider.   At its northern ex-
tremity it turns to the east, and its northern slope presents a
lateral face from west to east of upwards of 3,000 feet at least.
Along its base, and following it in this turn, in the direction in-
dicated, is a small stream called Bare Butte creek.   These
slopes are quite steep, and extend from base to summit about
1,200 to 1,300 feet.   The whole country is hilly and broken, and
this hill is only one of a series of similar elevations with which
it is more or less directly connected.   Northwardly across
Bare Butte valley, or gulch, which is there perhaps 500 feet or
more in width, is another hill known in this case as the 'Flor-
ence Hill,' whose southern slope extends laterally, from west
to east, nearly parallel with Custer hill.   Beginning, now, at
or near the southern extremity of the western slope of Custer
hill, at a point perhaps half way or more up the slope, there is

V.4DAK.—9

found an outcropping layer or stratum of a reddish quartzite or metamorphic sandstone several feet in thickness, (upwards of 10 feet at least,) overlaid by a body or stratum of limestone or dolomitic shale of a thickness not definitely ascertained, but certainly extending several feet above the quartzite. I do not mean to be understood as stating that this is the beginning point of this quartzite stratum; but at or near this place the hill turns to the west, and this is the furthest point northwardly or westwardly to which attention has been given in the case. From this point the croppings may be readily traced, in several places by high reef-like ledges jutting out boldly from the face of the hill, along the western face to its northern extremity. The general bearing of this line of croppings in the direction indicated is given by Mr. Dickerman, one of the defendants' witnesses, as N. 11 deg. W., the distance as 1,243 feet, and the angle of inclination upwards, from south to north, as 3 deg. 26 min. Mr. White, a witness for plaintiffs, gives the distance as 1,300 feet, and the angle of inclination as somewhat less than that stated. At the northern extremity of the hill this line of outcrop of quartzite, with its overlying limestone or dolomite, turns and extends along the northern slope with a downward inclination, thus gradually nearing the base of the hill, until, at a distace of something over 2,500 feet, (not established by the testimony,) it disappears beneath the bed of the creek.

"There is much conflict of testimony as to whether this last line of outcrop was originally traceable by a natural exposure along the face of the hill, or whether the discoveries on this side were made by following up the quartzite float, or pieces of detached rock, which had rolled down the hillside, and the edge of the stratum afterwards traced by means of the numerous workings which have since been made there. There is considerable natural exposure towards the eastern end of the line, but the hillside there is very precipitous and inaccessible. Mr. Frank Davey testifies to a natural exposure of quartzite all along the face of the hill on the line which I have called the line of outcrop; but I do not remember any other witness who testifies positively to this, while numerous witnesses testify

that, although they looked for such exposure, they could not find any, at least in the Sitting Bull location; and I think it clearly appears from the testimony of Donegan, the original locator of the Sitting Bull, that ne was led to his discovery entirely by float, and found no outcrop at all, except where he and his co-locator exposed it by uncovering the ledge. He says expressly that they found it by finding float down the hill, and followed it up until they couldn't find the float,—there they concluded must be the apex of a vein.  It should be mentioned, however, that considerable work was done upon the ledge, by which it was exposed in many places, and a road was cut along the hillside,—so that what Mr. Davey took for natural exposures may have been portions of the ledge uncovered by work.  There is no doubt, however, that whether it come within the strict definition of an outcrop or not,—given by one learned author (Geike) as 'the edges of strata which appear at the surface of the ground,' and by another (Van Cotta) as 'that portion of a vein appearing at the surface,'—the northerly edge of this stratum of quartzite, with its overlaying stratum of limestone, extends in the manner already indicated, on a line at or near the surface, all along the northerly face of the hill, and would seem to come within the definition given by Dr. Raymond in his glossary:  "The portion of a vein or stratum emerging at the surface, or appearing immediately under the soil and surface *debris.*'

"The general course and direction of this line of outcrop are indicated by Prof. Dickerman, who testifies that from the point on the outcrop already referred to, on the northern extremity of the hill, at the turn, to a point thence distant 1,950 feet, (about 100 feet west of the east end of the Sitting Bull location, hereafter described,) the bearing is N. 70 deg. 30 min. E., and the angle of declination 9 deg.  Along the whole line of this outcrop, as thus described, locations of mining claims appear to have been made, which I note here, as they have been referred to in the testimony, mainly for convenience of description and reference.  First on the south is the War Eagle location; north of that the Savage; then, on the same

face of the hill, the Custer. I believe another location called the Highland Chief embraces some part of this line, but have no reference to it. On the northern slope are, first the Neptune, then the Sitting Bull, and then the McClellan,—all located in an easterly and westerly direction, end to end, along this line of outcrop already described, extending across the northerly face of the hill. More specifically, with reference to the Sitting Bull, that location is situated about midway—east and west— of the northerly face of the hill, and extends from the point of discovery about 690 feet in a direction S. 74 30 W., (reversely N. 74 30 E.,) and from the same point about the same distance N. 89 30 E. The end lines are parallel, having a bearing of S. 35 deg. E. The claim is thus about 1,380 feet long, and is about 300 feet in width. Throughout this length the line of outcrop described is wholly within the side lines of the location, and passes through the end lines very nearly at their middle points. Adjoining the Sitting Bull on the south, and passing up the hill in the order named, are the Tiger Tail, Surplus, Fraction, and Silver Terra locations, all laid substantially parallel with the Sitting Bull. The Tiger Tail is owned or claimed by the defendants; the others by the plaintiffs, or some of them. Adjoining Tiger Tail and Surplus on the west, and the Sitting Bull on the north, is another claim of the plaintiffs' called the 'Richmond.' For the Silver Terra and Sitting Bull claims the plaintiffs and defendants respectively hold patents of the United States. As already stated, the ledge within the Sitting Bull location has been exposed by numerous excavations, and drifts have been run in various directions in the quartzite, from all of which more or less valuable silver ore has, from time to time, been extracted. The main working tunnel starts at a point near the discovery tunnel, and extends in a generally southeast direction about 700 feet across or through the intervening claims, and a short distance into the ground embraced within the vertically extended lines of the Silver Terra. Branching off from this main tunnel, and, as Mr. Frank Davey says, in every conceivable direction, are numerous extensive drifts. At the end or face of the main tunnel a large chamber has been

excavated, disclosing a body of valuable silver ore, which defendants were engaged in removing when stopped by the injunction issued in this action.

"All these workings are in the quartzite, disclosing throughout pretty much all their extent the overlying stratum of limestone, which forms the roof of the workings, and upon the contact of which with the quartzite the drifts have mainly been run, although in some places this roof has been broken into, and in other places, where the cleavage was imperfect, the quartzite has been left in place. This roof or wall is quite smooth and regular,—remarkably so, is the testimony of several of the more experienced witnesses. The floor of the workings is also in the quartzite, which is thus shown to have a thickness of at least seven feet, and other testimony established a thickness of at least ten feet. Beyond this its extent is uncertain.

"The defendants contend that by their excavations, one on the edge of the ledge outside and two within the workings, a chloritic quartzose shale has been discovered a few feet below the floor, essentially differing from the quartzite, and forming a distinct foot-wall. The plaintiffs deny any essential difference in the rock so disclosed, and claim that other explorations, which are testified to, establish the continuity of the quartzite for an undetermined extent downward, and contend that at all events the limited excavations made by the defendants are not sufficient to establish the existence of a foot-wall, as claimed. The evidence is practically undisputed that throughout its whole extent, so far as disclosed by the workings of the defendants, the quartzite is mineralized with iron and silver in various forms of deposit; the iron being mostly in the form of an oxide, giving a reddish tinge to the rock, and the silver existing in the form of native silver, sulphurets, chlorides, bromides, ruby silver, and carbonates. These silver ores are found impregnating the quartzite more or less throughout, it being in some places considerably decomposed, and in others retaining its massive appearance, with little or no external indication of richness; but Mr. Davy testifies that among some

thousands of assays of this quartzite, taken from time to time from all parts of the workings, he has never found any which did not show an appreciable quantity of silver. Besides the forms of deposit already mentioned, bodies of galena bearing silver are also found distributed in bunches, pockets, and bands or sheets of varying extent throughout the workings, but not in any continuous body. Generally these ore deposits are found to be richest along the contact of the roof, extending three or four feet downward. Sometimes they are found lower down. Occasionally the galena would shoot up in the limestone, then again down to the floor.

"Prof. Dickerman is of the opinion that this galena was brought up and deposited in a molten condition, and that all the other forms of deposit have proceeded from it by decomposition and impregnation. Mr Riotte, another expert witness for defendants, and a gentleman of large experience and scientific attainments, is of the opinion that at or about the time of the first metaphorphism of sandstone into quartzite the galena was brought up in solution by means of a hot spring, and that long subsequently the second metaphorphism of the quartzite took place into its present condition, which he says is strictly quartz, and then the other silver ores were brought up and deposited by similar means. Between these two theories I do not feel called upon to decide. I am satisfied that whatever the cause, the result was a continuous impregnation and mineralization of the quartzite with silver throughout, so far as disclosed by the Sitting Bull workings, and extending to the grounds in controversy.

"Following the main working tunnel from the point where it passes through the south side line of the Sitting Bull, through the intervening ground, and into the ground in controversy, the floor of the tunnel and the roof in the line of direction of the tunnel have a general downward inclination of about 4 deg.,—greater where it trends to the east, less where the trend is towards the south. Upon the Richmond location, before mentioned, plaintiffs have sunk a shaft, from which at a depth of 100 feet a drift or tunnel has been run by them, ex-

tending in a southeasterly direction to where it reaches the vertically extended north line of the Surplus; then turning somewhat more to the east, until it passes the north line of the Silver Terra; and then again turning in a direction very little south of east, until it passes some distance beyond the point where it would be intersected by a continuation of the defendants' main drift,—heading it off, so to speak,—and separated from it at that point by not more than four or five feet of intervening rock.  This tunnel, throughout its whole entent of some 800 feet, was run in the quartzite, disclosing and following the overhanging roof of limestone, and encountering several bodies of galena and other pay ore; but although very little testimony was offered on this point, I understand the plaintiffs to say that except where these ores were encountered they did not consider the quartzite rich enough to pay.  Incidental mention was also made in the evidence of tunnels run in for short distances on the quartzite from the west on the War Eagle, Savage, and Custer locations.  I may add here that, except at the entrance to the drifts, the workings are not timbered,—the rock everywhere being found firm and massive.  Of course, pillars are left at proper intervals.

"The facts thus far given are, I believe, mainly uncontradicted, except where otherwise stated.  I come now to a consideration of those about which there has been more or less conflict of testimony.  Foremost and most important of these is the question as to the direction of the dip or downward course of this stratum of quartzite, with its overlying limestone.  Upon this point a large number of witnesses were examined, and a great deal of testimony taken.  Many surveys were made by different methods, and with various kinds of instruments, the value of all of which depends largely upon the degree of care, judgment, and honesty exercised in selecting points of observation.  A number of maps were exhibited illustrating various methods and results, and models of the hill were introduced by both sides, showing the general contour of the hill, and a section thereof in the plane of the quartzite stratum; but inasmuch as these models and maps purport to be constructed

mainly from the surveys, they are, of cou1se, to be regarded as illustrations, correct only in so far as they conform to those surveys.   I shall not attempt an extended analysis of all this testimony, but shall briefly review it and give the result."

The court here reviews the testimony upon this point, and concludes thereupon as follows:   "I think it will be sufficiently correct for the purposes of this case, and, indeed, I do not see how any essentially different result can be reached from the testimony, if we determine that the dip of this stratum of quartzite with its overlying limestone, is east.   The general angle of declination of this stratum, or its departure from the horizontal, I find to be from $7\frac{1}{2}$ to 8 deg.   If it were taken from the westerly line of outcrop, a somewhat greater angle would be given; but the evidence seems to show that by some means, probably by the occurrence of a porphyry dyke which is found there, the northeast corner of the hill has been slightly tilted up, causing a local variation.

"There was considerable discussion and variety of opinion as to whether the stratum of quartzite outcropping along the southerly face of the Florence hill was to be regarded as having originally formed a continuation of that in the Custer hill, the plaintiffs contending that it corresponds in the conditions of its occurrence and general characteristics, as well as in the inclination downward towards the creek, with the stratum in controversy, while this is denied by some of the defendants' witnesses, especially by Mr. Riotte.   From all the testimony on this point, I think it probable that the sedimentary rocks composing both these hills were originally deposited in similar and continuous formation; that by some dynamic process these hills were subsequently elevated to their present positions, and the characteristic conditions of their respective rocks somewhat differentiated; that by the same process of upheaval the waters of Bare Butte creek were directed into a channel having the general direction of its present course; and that by the erosive action of these waters, and the gentler but equally efficient forces of rain and snow and frost, the edges of these strata have been exposed, to be again covered by the gradual accumu-

lation of soil upon the hill-sides. But of these ancient and gigantic processes of nature it becomes us to speak with great diffidence, and I do not deem this point essential to the determination of the case. It is also claimed by defendants that along the northerly face of the hill, and for a width, say, of 50 to 75 feet,—perhaps a little more in some places,—the edge of the strata have been broken up and disintegrated by the action of the elements, and in this condition have yielded to the downward 'slide' of the surface, and have been somewhat bent over, so as to impair the value of observations taken within that region. It is true that the testimony shows the limestone to be much broken up towards the edge, as it naturally would be; but whether it is actually bent over, or to what extent, does not clearly appear, nor do I think it clearly appears that the quartzite has been dislocated by this process. At all events there are no data from which any certain result can be ascertained as due to this circumstance, and I cannot regard it as essentially varying the conclusions reached.

"I pass now to a consideration of the law governing this case, and the legal inferences to be derived from its application to the facts thus ascertained. Recurring to the proposition laid down in the earlier history of the case, that by their possession, and *a fortiori* by their entry and patent, of the Silver Terra claim, the plaintiffs show themselves entitled to everything within the vertically extended side lines of that claim, including even a body of ore forming part of a vein, lode or ledge, having its origin or beginning outside of those lines, until some one shall appear to claim it with a better title, as the proprietor of such vein, (it being conceded, as I understand it, that the Silver Terra location was not based upon a discovery of this particular ore body, or of any vein, lode or ledge of which it formed a part,) and recalling also the conditions under which alone such better title can be made to appear, we inquire:

First. Is the ore body in controversy part of a vein, lode, or ledge of quartz or other rock in place, bearing silver, within the meaning of the statute? Various definitions have been giv-

en of 'veins' and 'lodes.'   I shall seek no new one, but content myself with stating a few which have received high judicial sanction.   Justice HALLETT'S definition is: 'A body of mineral or mineral bearing rock, within defined boundaries, in the mass of the mountain.'   Judge GODDARD gives this definition: 'Any mineralized belt or zone of rock, lying within boundaries clearly distinguishing it from the. neighboring rock, coming from the same source, impressed with the same forms, and appearing to be created by the same process.'   This. definition was originally given by Justice ———.   Justice FIELD gives the same difinition, and also the following: 'A continuous bed of mineralized rock, lying within any other well defined boundaries on the earth's surface, and under it.'   And Justice MILLER quotes approvingly all the definitions above given.   In the great case of the Richmond Co. v. Eureka Co., 103 U. S. 839; tried before Justices FIELD, SAWYER and HILLYER, the evidence showed a zone or belt of limestone between walls of quartzite and shale. This limestone was much broken up, disintegrated and fissured, and throughout these fissures ore was deposited in irregular bunches, patches, caverns and spaces of every variety of form and size, irregularly disseminated through the mass, with a succession of great cavities lying irregularly across the limestone, the whole mass being irregularly impregnated with the ore.   This was held to constitute one lode, within the meaning of the law.   Dr. Raymond has somewhere defined a 'lode' as that which the miner can follow, expecting to find ore.

"Two of the defendants' witnesses, Messrs. Dickerman and Riotte, gave it as their opinion that the deposits of galena in this mine constituted a vein, within and separate from the lode, and having a downward direction nearly parallel with the end lines of defendants' claim; and it was contended that this constituted a vein which would meet the conditions proposed, and give the defendants the right to follow it into plaintiffs' ground. But I do not find any evidence which at all satisfies me either as to the continuity of this galena deposit, apart from the lode, or as to its direction.   Nor do I perceive how, consistently with the other evidence, it can be claimed that this could be followed

and worked separately from the lode. The only evidence of direction that I recall, is found in the testimony of Mr. Riotte, who says that he found *striæ* or furrows in the contact; that *striæ* invariably indicate the direction of ore chutes in a vein; and that in any given vein the ore chutes are always parallel; and that in one place in this vein where he found *striæ* he took their direction with a compass and found it to be a little north of southeast. As to the existence of *striæ* and their indications I think he is corroborated to a limited extent by Prof. Dicker-man. But besides that, I am not satisfied that Mr. Riotte's theory is one generally accepted by scientists. I am not willing to place a finding upon so slender a basis of facts. No other witness that I remember advanced this view, and, indeed, Mr. Riotte himself, after giving the same definition of a lode as that of Dr. Raymond, just quoted, and in answer to a question by the court as to whether these chutes of ore or the body of the quartzite would be the lode which would lead the miner on, answered: 'The body of quartzite, decidedly.'

"A somewhat similar theory was advanced by the witnesses of the defendant in the Eureka–Richmond Case, though with a different purpose, respecting deposits attempted to be designated as separate veins. But, in the language of the court in that case, 'they are but parts of one greater deposit, which permeates in a greater or less degree, with occasional intervening spaces of barren rock, the whole mass of limestone.' Substituting 'quartzite' for 'limestone,' these words are apt and pertinent to the present case. And while I am not entirely satisfied of the existence of the particular foot-wall claimed by the defendants, yet I consider that a stratum of massive rock of this character, overlaid by a solid mass of limestone, and mineralized as this is, comes clearly within the definition given; and I must therefore find this body of quartzite to be a vein, lode, or ledge of rock in place, bearing silver, within the meaning of the statute.

"Secondly. Is the top or apex of this vein or lode within the lines of the Sitting Bull location? The definition of the top or apex of a vein usually given is: 'the end or edge of a vein

nearest the surface;' and to this definition the defendants' insist we must adhere with adsolute literal and exclusive strictness, so that wherever, under any circumstances, an edge of a vein can be found at any surface, regardless of all other circumstances, that is to be considered as the top or apex of the vein. The extent to which this view was carried by the defendants, and, I must confess, its logical results, were exhibited by Prof. Dickerman, their engineer, who, replying to an inquiry as to what would be the apex of a vein cropping out at an angle of 1 deg. from the vertical, on a perpendicular hill side, and cropping out also at a right angle with that along the level summit of the hill, stated that in his opinion the whole line of that outcrop, from the bottom clear over the hill as far as it extended, would be the apex of the vein. Some other witnesses had a similar opinion. The definition given is no doubt correct under most circumstances, but, like many other definitions, is found to lack fullness and accuracy in special cases; and I do not think important questions of law are to be determined by a slavish adherence to this letter of an arbitrary definition. It is indeed difficult to see how any serious question could have arisen as to the practical meaning of the terms 'top' or 'apex,' but it seems in fact to have become somewhat clouded. I apprehend if any intelligent person were asked to point out the top or apex of a house, a spire, a tree, or hill, he would have no difficulty in doing so, and I do not see why the same commonsense should not be applied to a vein or lode. Statutory words are to receive their ordinary interpretation, except where shown to have a special meaning; and, as I think the testimony shows that these terms were unknown to miners in their application to veins before the statute, the ordinary rule would seem to apply to them.

"Justice GODDARD, a jurist of experience in mining law, in his charge to the jury in the case of Iron Silver v. Louisville, defines 'top' or 'apex' as the highest or terminal point of a vein 'where it approaches nearest the surface of the earth, and where it is broken on its edge, so as to appear to be the beginning or end of the vein.' Chief Justice BEATTY, of Nevada,

who is mentioned in the report of the public lands com-
mission of 1879–80 as 'one of the ablest jurists who has
administered the mining law,' in his letter to that com-
mission, says, after defining dip and course of strike:
'The top or apex of any part of a vein is found by fol-
lowing the line of its dip up to the highest point at which
vein matter exists in the fissure.' According to this definition,
the top or apex of a vein is the highest part of a vein along its
entire course. If the vein is supposed to be divided into sec
tions by vertical planes, at right angles to the strike, the top
or apex of each section is the highest part of the vein between
the planes that bound that section; but if the dividing planes
are not vertical, or not at right angles to a vein which departs
at all from a perpendicular in its downward course, then the
highest part of the vein between such planes will not be the
top or apex of the section which they include.' Report Pub.
Lands Com. 389.

"I am aware that in several adjudged cases 'top' or 'apex'
and 'outcrop' have been treated as synonymous, but never, so
far as I am aware, with reference to a case presenting the same
features as the present. The word 'apex' ordinarily designates
a point, and so considered the apex of a vein is the summit; the
highest point in a vein is the ascent along the line of its dip or
downward course, and beyond which the vein extends no fur-
ther, so that it is the end, or, reversely, the beginning, of the
vein. The word 'top,' while including 'apex,' may also include
a succession of points,—that is, a line,—so that by the top of a
vein would be meant the line connecting a succession of such
highest points or apices, thus forming an edge.

"I have spoken of the 'dip' or 'downward course' of the
vein, treating these words as synonymous, and so I think they
must be regarded. 'Dip' and 'depth' are of the same origin,—
'dip' is the direction or inclination towards the 'depth'—and it
is 'throughout their depth' that veins may be followed, and that
is surely their downward course. Mr. Riotte gives us a differ-
ent definition. He says: 'Starting any line upon the apex of
the vein, and running down upon the vein parallel to the end

lines, (of the location) the inclination that line has is the downward course of the vein.' And when asked: 'So that the direction of the end lines of a mining location absolutely fixes the downward direction of the course of the vein?' he replies: 'As far as it interests the man who has located that claim. Elsewhere he says that, in his view of the law, end lines of locations are, as he expresses it, 'swingable;' so that when the locator determines the direction of his ore chutes he may swing his end lines parallel to them, so as to take them in throughout their depth. A very little reflection will show that if this be the law, a locator, instead of being limited to 1,500 feet along the vein, could readily place his end lines at such an angle as practically to control nearly 3,000 feet of the vein. With all proper respect for this gentleman's opinion, I cannot accept his views upon this subject at all. I think it clear that the law intended these lines to be laid substantially at right angles to the general course or strike of the vein, since in no other way could the locator be limited to a given length along the ledge.

''This seems to have been the view taken of the law by the three learned judges who sat in the Richmond-Eureka case. It is true that they hold that the provisions of the law of 1872 requiring parallel end lines may be regarded as merely directory, so that a failure to so lay them would not invalidate the location; but I think the whole force of the observations of the court upon this point lies in their assumption that it makes no difference how the miner may choose to locate his end lines, since the law limits his right to that section of the lode or ledge carved out by vertical planes drawn through the extreme points or ends of his line of location at right angles with a line representing the general course or strike of the lode. In this same case, on appeal to the supreme court of the United States (103 U. S, 844), the fact is noted that the 'zone,' as it is called, dips at right angles to its course or strike. and that the extension downward of the compromise line, which was coincident with the end lines of the adjacent claims, followed the dip of the zone.

''I have been led into some digression from the strict line of my argument. Bearing in mind the descriptions heretofore

given of the two lines of outcrop on Custer hill, if we might suppose that the outcrop along the northerly face were nearly vertical, I do not see how it could be seriously contended that such outcrop, under the circumstances, constituted the top or apex of this stratum of quartzite. Such a conclusion could only be reached, it seems to me, by shutting one's eyes to every feature of the case, except the one fact that there was an edge at or near the surface, which was therefore the top or apex of the vein. This I cannot do without such a violation of the ordinary use of words, and, with all the respect and deference which I feel for the opinions of the learned counsel for the defense, I must say without such a transgression of the dictates of a sound common-sense view of the situation, as, in my judgment, the statute does not contemplate. Nor can I see that there would be any difference whatever in the principle were this outcrop to be found at an angle of 45 deg., or, as it is, at an angle of about 8 deg. from the horizontal. I am compelled, therefore, to hold that this outcrop found in the Sitting Bull location is not the top or apex of this vein, lode, or ledge, and that such top or apex is not within that location. I must regard that outcrop as merely an exposure of the edge of the vein on the line of its dip.

"But, thirdly, if this is not the top or apex of the vein, then neither is it its longitudinal course. That by the use of the term 'along the vein' the statute requires a location to be made along its longitudinal course or strike I shall not stop to argue. Such, again, was the opinion of the court in the Eureka-Richmond Case. But by the term 'strike' in this connection, I do not mean the technical true strike of the engineer; the line which would be cut by a horizontal plane. Such a requirement would be in many cases impracticable. The supreme court of the United States has said in the Flagstaff Case (Mining Co. v. Tarbet, 98 U. S. 463), that 'the most practicable rule is to regard the course of the vein as that which is indicated by surface outcrop, or surface explorations and workings;' and I have no disposition, as I should not be at liberty, to disregard the doctrine of that case, so far as it is applicable to the circumstances.

In that case a line of outcrop ran up a hill nearly in a westerly direction. A level line run somewhere beneath the surface showed the 'strike' to be north 50 deg. west. The line of the Titus location was not far from midway between these two, and the court held, as against the Flagstaff, which was laid across these lines, that the location of the Titus was a good one, using the language above quoted. There, moreover, the dip of the vein was northeastward, and no such question arose as that involved in this case. In view of the principles already laid down, I think that the longitudinal course of this zone of quartzite is indicated by the croppings on the west face of the hill, and not by those on the northerly slope.

"After what has been said, it would seem unnecessary to consider whether this vein so far departs from a perpendicular in its course downward as to extend outside the vertically extended side lines of defendants' location, and through the intervening ground to the ground in controversy.—such could not be the case consistently with the facts already ascertained. It may be conceded as, indeed, a mathematical conclusion from the facts, that by extending drifts from the Sitting Bull location through its vertically extended south side line, in any direction upon the vein east of south, a downward inclination would be found, and that such is the fact with regard to the main working tunnel, which extends to the ground in controversy; but, clearly, this is not what the statute contemplated, and, if I am right in my other conclusions, probably this proposition would not be contested."

We concur in the views thus expressed.

It was unnecessary for the court to determine affirmatively the precise location of the top or apex of the vein in question. The court did find "that the outcrop on the westerly slope of the hill above described was the summit, top, or apex of said zone, ledge, or stratum of quartzite," but did not determine whether or not it was technically the top or apex of the vein. Possibly that might have involved an inquiry as to the continuity of its mineralization to the summit. The question the district court had to determine was whether the top or apex of

this vein was or was not within the Sitting Bull location. It determined that it was not, and, as we think, correctly.

The judgment and orders appealed from are affirmed, and the findings and conclusions of the district court are adopted by this court.

For affirmance: EDGERTON, C. J., HUDSON, CHURCH, PALMER, and SMITH, JJ.

For reversal: FRANCIS, J.