# THE SUPREME COURT

#### OF THE

## STATE OF NEVADA

### JULY TERM, 1916

[No. 2195]

JIM BUTLER TONOPAH MINING COMPANY (A
CORPORATION), APPELLANT, *v.* WEST END CON-
SOLIDATED MINING COMPANY (A CORPORA-
TION), RESPONDENT.

[158 Pac. 876]

1. MINES AND MINERALS—EXTRALATERAL RIGHTS—END LINES.
    As regards extralateral rights under Rev. Stats. U. S. 2322
    (U. S. Comp. Stats. 1913, 4618), where a patented mining loca-
    tion is in the form of a parallelogram, except for the exclusion,
    for conflict, of a triangular piece at a corner, the remainder of
    what would have been the end line but for such exclusion is
    the end line; the interior line of the excluded triangle being
    one, or a part of one, of the side lines, and not part of a
    broken end line.

2. MINES AND MINERALS—EXTRALATERAL RIGHTS—OPPOSITE DIREC-
    TIONS.
    Rev. Stats. U. S. 2322, limiting extralateral rights to the
    part of a vein between vertical planes drawn downward
    through the end lines, continued "in their own direction,"
    does not negative extralateral rights in opposite directions;
    the end lines having two directions.

3. MINES AND MINERALS—EXTRALATERAL RIGHTS—ANTICLINAL FOLD
    VEIN—"APEX."
    Within Rev. Stats. U. S. 2322, giving extralateral rights as
    to veins the tops or apexes of which are within the surface
    lines of the located claim, the crest of a vein in the form of
    anticlinal fold is the apex; a terminal edge not being neces-
    sary for an apex.

APPEAL from the Fifth Judicial District Court, Nye County, *Mark R. Averill,* Judge.

Action by the Jim Butler Tonopah Mining Company against the West End Consolidated Mining Company. Judgment for defendant, and plaintiff appeals. **Affirmed.** [On writ of error to United States Supreme Court.]

## STATEMENT OF FACTS

This is an action brought by the appellant, the Jim Butler Tonopah Mining Company, against the respondent, the West End Consolidated Mining Company, to recover damages for ore extracted by the respondent and situated vertically beneath the surface of the Eureka and Curtis lode mining claims owned by appellant, and also for an injunction restraining the defendant from committing further trespass. The respondent owns the adjoining West End lode mining claim, and asserts the right to mine extralaterally on the vein and ore bodies in dispute by virtue of the ownership of this claim, which it contends embraces the apex of the vein, so situated with reference to the boundaries of the claim that it can avail itself of the extralateral grant contained in the federal mining statutes. The court found, among other facts, the following:

"That there is a vein or lode of rock in place, which, at its top or apex, and on its course or strike, crosses the easterly end line of said West End mining claim 130 to 140 feet northerly from the southeasterly corner of said mining claim, and thence, at its top or apex, and on its course or strike, continues westerly in said mining claim between the side lines thereof to a point on the northerly side line of said claim 1,142½ feet westerly from the northeast corner of said claim, at which point the said vein, at its top or apex, and on its course or strike, departs from said mining claim, crossing said northerly side line. That said vein dips southerly, and in its downward course so far departs from the perpendicular as to pass beyond the southerly side line of said West End

mining claim, extended downward vertically, and thence into and beneath the surface of the said Eureka lode mining claim and the said Curtis lode mining claim of the plaintiff company.

"The said vein does not on its upward course, or at its top or apex, outcrop or reach the present surface, but is covered or buried to a considerable depth by lava, locally known as and called 'Midway' andesite, which, after the formation of the vein, flowed over the then surface of the territory in which the vein exists; that at and for a distance of 360 feet westerly from where said vein or lode crosses the easterly end line of said West End claim, which crossing is at a distance of 135 feet northerly from the southeast corner of said West End claim, there is a juncture, or union, between two limbs or sides of said vein, and from the summit of said juncture, or union, the downward course of one limb or side thereof is in a northerly direction, and the downward course of the other limb or side thereof is in a southerly direction; that there is a continuation upward from the summit of said juncture, or union, of said northerly and southerly dipping limbs or sides of said vein of ore and silver-bearing quartz or rock in place for a distance from 20 or 30 to more than 100 feet, and to what was the surface before the same was buried beneath the said lava flow; that such ore and silver-bearing quartz were deposited where the same are now found at the same time and during the same period that the main vein below was created, and from mineral-bearing solutions having the same source; that the dip is fairly conformable, and strike, or course, of such upward continuation of ore and silver-bearing quartz is conformable to the dip and strike, or course, of said northerly dipping limb or side of said vein from the summit of said juncture downward, and the court finds that said upward continuation is a part of said vein or lode; that thence westerly, and for a distance of 360 feet, the northerly and southerly dipping limbs, sides, or slopes of said vein do not unite or form

a union, or juncture, in their upward course, but for that distance each of said limbs or sides has a separate and independent top or apex; that thence westerly, for a distance of 40 feet, the northerly and southerly dipping limbs, sides, or slopes of said vein are again found in conjunction as in the said most easterly 360 feet; that thence westerly, and until said northerly and southerly dipping limbs, sides, or slopes of said vein intersect with and cross said northerly side line of said mining claim, they do not unite or form a union or juncture in their upward course, but for that distance each of said limbs or sides has a separate and independent top or apex; that between said distance of 40 feet, where said northerly and southerly dipping limbs, sides, or slopes of said vein, as aforesaid, unite or form a union or juncture in their course upward, and said points on said northerly side line of said mining claim, where, as aforesaid, said contra dipping limbs, sides, or slopes of said vein respectively intersect said side line and cross the same, and so depart from said mining claim, there are two points at which it appears that said contra dipping limbs, sides, or slopes of said vein on their upward course approach closely to a juncture or union, but as to said contra dipping limbs, sides, or slopes of said vein at said two points, actually forming a juncture or union on their upward course, the evidence is meager and unsatisfactory; that the point where the said northerly dipping limb or side of said vein departs from the said mining claim through the northerly side line thereof is 1,120 feet westerly from the northeast corner of said claim, measured along the northerly side line thereof; that the point where said southerly dipping limb or side of said vein departs from said mining claim through the northerly side line thereof is 1,142½ feet westerly from the northeast corner of said claim, measured along the northerly side line thereof; that throughout said distance of 40 feet, where the contra dipping limbs or sides of said vein are found in conjunction, as hereinbefore stated,

there is a continuation upward from the summit of the juncture or union of said two limbs or sides of said vein of ore or vein quartz to what was the surface before the same was covered by the lava flow; that the dip or downward course of both the northerly and southerly dipping sides or limbs of the vein where the two are found in conjunction, as aforesaid, and also in the places where each, as aforesaid, has its separate and independent top or apex, is regular, and practically free from undulations; that the said southerly dipping limb or side of the vein in the easterly portion of the West End claim, that is to say, the easterly 360 feet thereof, has been developed from the top or summit of said juncture of said contra dipping limbs to and beyond the southerly side line of said claim, or for a distance, measured on the slope or downward course of said southerly dipping limb or side, of 800 feet or thereabouts, the average dip there being 17 degrees from the horizontal; that the westerly portion, that is to say, the westerly 300 feet of said southerly dipping limb or side of said vein found in the West End claim, has been developed from its top to and beyond the southerly side line of said claim, or for a distance, measured on its slope or downward course, of 1,000 feet or thereabouts, the average dip there being 30 degrees from the horizontal; that the average dip of said northerly dipping limb or side of said vein, so far as the same has been developed in its downward course, is 17 degrees from the horizontal; that said vein is a fissure vein; that there is a difference in the strikes or courses of said northerly and southerly dipping limbs of said vein of about 40 degrees; that at said places and throughout said distances, where said contra dipping limbs of said vein are found to intersect and form a juncture, as aforesaid, there has been a mingling of the mineralizations of said two limbs of said vein within the angle beneath the juncture of the said two limbs; that at such places and throughout said distances the footwall of said two limbs of said vein, within the angle beneath their said juncture, by the process

of replacement has been converted into mineralized quartz for considerable distances below said juncture, said replacement quartz extending from limb to limb."

Appellant bases its appeal from the decision of the trial court on the following grounds:

### "A. Erroneous Findings of Fact

" (1) That the finding of the trial court that the two sides of northerly and southerly dipping slopes of the single vein involved are not united at the crest of the anticlinal roll, but are separated for considerable distances within the West End claim, thus forming separate terminal edges along the upper edges of each of these stopes, is unsupported by the evidence.

" (2) That the finding of the trial court, giving the occurrences of quartz in the 'A' series of raises the dignity of a vein, is not justified by the evidence, and, further, that no matter what may be its character, it admittedly dips to the north and has no bearing on a claimed extralateral right extending to the south.

### "B. Errors of Law

" (1) The trial court found that the discovery in the West End claim was on the northerly dipping portion or slope of the vein, and in spite of this finding awarded an extralateral right to appellee on the southerly dipping limb or slope of the vein. Appellant contends that this is an erroneous construction of the federal statute granting the right to follow a vein extralaterally, and that extralateral rights in two opposite directions, attaching to the same mining claim and the same vein, are not contemplated by this statute.

" (2) The trial court found that the northerly and southerly dipping limbs or sides of the vein were united and joined at the crest of the roll for a considerable distance within the West End claim. Appellant contends that the court should have denied the appellee the right to follow the vein extralaterally where such a condition exists, and that no extralateral right whatsoever attaches to an anticlinal occurrence in a vein, since the latter does

not constitute an apex within the meaning of the federal mining statute.

"(3) The westerly end line of the West End claim is a broken line. Appellant contends that no extralateral right whatsoever may be exercised under such circumstances, since such right attaches only to mining claims possessing straight end lines."

The following diagram represents a cross-section of the vein where the two limbs have been shown by development work to be united at the crest of the anticlinal fold:

*Curtis H. Lindley, Wm. E. Colby, Hugh H. Brown,* and *J. H. Evans,* for Appellant:

The judgment of the lower court should be reversed.

Section 2322, U. S. Revised Statutes, does not justify the exercise of an extralateral right on the same vein on two downward courses and in opposite directions, since the wording of the statute will not permit of such a construction. This is especially true where the limb of the vein on which the discovery was made dips in the opposite direction from its limb in which the disputed ore bodies occur.

One of the essential elements of an apex is that it shall have a terminal edge, and that when the vein turns over

and dips in an opposite direction, the resulting anticlinal roll has no legal apex, as is held by all the authorities that have considered the question.

The westerly end line of the West End claim is a broken line, which is in contravention of the mandatory provision of the statute requiring end lines to be parallel and necessarily straight.

Section 2322 of the Revised Statutes does not contemplate the exercise of an extralateral right in two opposite directions. The question is squarely raised as to whether two extralateral rights can be predicated on the same location and exercised on the same vein in opposite directions. The vital part of the grant involved is contained in the language which confines the extralateral segments of the vein "to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations, so continued in *their own direction* that such planes will intersect such exterior parts of such veins or ledges." This language admits only of the interpretation that such planes shall be extended in one direction, and that would be in the direction of the dip of the vein on which the discovery was made. The courts have held that a claimant may follow his vein on its downward course through an end line when the apex of the vein crosses parallel side lines. (*King* v. *Amy D. Silversmith M. Co.*, 152 U. S. 222; *Bunker Hill-Last Chance Cases*, 131 Fed. 579, 591.)

While ordinarily the term "claim" is synonymous with "location," and they are frequently used interchangeably, the term "claim" may embrace more than one location, and frequently a consolidation of mining locations held and worked under one ownership is held to constitute and be properly designated as a "claim." (*Del Monte M. Co.* v. *Last Chance M. Co.*, 171 U. S. 55, 74.) Section 2322 of the Revised Statutes does not refer exclusively to the extralateral rights pertaining to a single location, and the idea of extralateral rights arising out of a number of consolidated locations was within the contemplation of Congress when said statute was adopted. (*Carson City M.*

*Co.* v. *North Star M. Co.,* 83 Fed. 658; *St. Louis Smelting Co.* v. *Kemp,* 104 U. S. 636, 648; *McFeters* v. *Pierson,* 24 Pac. 1076; *N. P. R. R. Co.* v. *Sanders,* 49 Fed. 129, 135; *In Re Mackie,* 5 L. D. 199; *Tredinnick* v. *Red Cloud M. Co.,* 13 Pac. 152; *Malone* v. *Big Flat G. M. Co.,* 50 Pac. 378; *Salt Lake Co.* v. *Chainman M. Co.,* 137 Fed. 632, 642; *Phillips* v. *Salmon River M. & D. Co.,* 72 Pac. 886; *Thompson* v. *Wise Boy M. & M. Co.,* 74 Pac. 958; *Idaho M. Co.* v. *Davis,* 123 Fed. 396, 399.)

Prior to the act of 1872, and under the local rules and customs, the miner was entitled to but one vein. While end lines were not specifically mentioned in the statute of 1866, they were implied. (*Eureka Case,* 4 Sawy. 302, 323; Fed. Cas. No. 4548.) The right to follow the one vein was in the direction of its downward course. This established planes beyond which the miner could not go. Under the act of 1866, the lode was the principal thing, and the surface was in reality an incident. (*Johnson* v. *Parks,* 10 Cal. 447; *Patterson* v. *Hitchcock,* 3 Colo. 113; *Walrath* v. *Champion M. Co.,* 63 Fed. 553.) Where the claim was included within a defined surface, this surface could not be invaded for the purpose of searching for other lodes. (*Atkins* v. *Hendree,* 1 Idaho, 107.) After patent which conveyed but the one lode, the patentee would acquire title to all subsequently discovered veins to the extent that they might be found within the vertical boundaries of his claim. This is the rule applied to placers in cases of lodes or veins discovered subsequent to the application for patent. While the law did not contemplate that any lodes existed, yet, where they were unknown at the time of the application for patent, they passed by operation of law to the placer patentee to the extent they might be found within the vertical placer boundaries. Under the act of 1872, the vein is still the principal thing, in that it is for the sake of the vein that the location is made. (*St. Louis M. Co.* v. *Montana M. Co.,* 194 U. S. 235, 238; *Del Monte M. Co.* v. *Last Chance,* 171 U. S. 55, 75.)

The discovery of the vein has always been essential,

and it is contemplated that this should be disclosed in the discovery shaft, and the direction of its course and dip ascertained. When this is done a plane is established on the discovery vein in the direction of the dip. The courts, when dealing with secondary veins, have announced the rule that when the end-line planes of a mining location are once fixed they bound the extralateral rights to all the lodes that are thereafter found within the surface lines of the location. (*Walrath* v. *Champion M. Co.*, 63 Fed. 552, 557.)

In construing section 2322, Revised Statutes, it must be borne in mind that statutes are always to receive the most reasonable and sensible construction possible, so as to avoid injustice and hardship, injury and absurd conclusions, and conform to dictates of natural reason. (*Heydenfeldt* v. *Daney Co.*, 93 U. S. 634, 638; *Law Our Bew* v. *U. S.*, 144 U. S. 47, 59; *In Re Chapman*, 166 U. S. 661, 669; *Scottish Insurance Co.* v. *Bowland*, 196 U. S. 611, 629; *Jacobson* v. *Massachusetts*, 197 U. S. 11, 39; *Low Haw Suey* v. *Backus*, 225 U. S. 460, 475.)

The broken end line of the West End claim prevents the exercise of any extralateral right. It is in direct contravention of the statute. "The end lines of each claim shall be parallel to each other." (U. S. Rev. Stats. sec. 2320.) The extralateral right shall be confined by "vertical planes drawn downward through the end lines of their locations." (U. S. Rev. Stats. sec. 2322; *Del Monte M. Co.* v. *Last Chance M. Co.*, 171 U. S. 55, 84.) The law requiring strict parallelism of end lines is mandatory, so that if a locator sees fit to disobey its explicit terms and accept a patent calling for a broken end line, he must suffer the penalty and lose his right to pursue the vein extralaterally. (*Daggett* v. *City of Yreka M. T. M. Co.*, 149 Cal. 357, 86 Pac. 968; *Central Eureka Co.* v. *E. Central Eureka Co.*, 146 Cal. 147; *Walrath* v. *Champion M. Co.*, 171 U. S. 293; *Belligerent and Other Lode Mining Claims*, 35 L. D. 22; *Pilot Hill and Other Lodes*, 35 L. D. 592.)

The crest or axis of an anticlinal roll in a vein is not

its top or apex within the meaning of the mining laws. The element of terminal edge is a part of the legal definition of the term "apex." (Costigan on Mining Laws, 139, 140.) Mere proximity to the surface is insufficient to establish the apex. (Barringer and Adams, The Law of Mines and Mining, 442; Shamel, Mining, Mineral and Geological Law, 193, 197; Mines and Minerals, 27 Cyc. 527; Raymond, Glossary of Mining and Metallurgical Terms, Trans. Am. Inst. M. E., vol. IX, p. 102; *Duggan* v. *Davey,* 4 Dak. 110, 26 N. W. 887; *Illinois S. M. Co.* v. *Raff,* 34 Pac. 544; *Stevens* v. *Williams,* Fed. Cas. No. 13413, p. 40, 43; *Iron S. M. Co.* v. *Murphy,* 3 Fed. 368, 375–76; *Stewart M. Co.* v. *Ontario M. Co.,* 35 Sup. Ct. Rep., 610, 614–15.)

The finding that the two sides or slopes of the vein are separated for a portion of their extent and have separate tops or apices is unsupported by the evidence, as is the finding that there is an upward extension of vein from the crest or axis of the anticlinal roll. The burden of proof was upon the respondent. This situation was recognized in the lower court, and the case was tried as if defendant had been the plaintiff in the action and asserting its extralateral right affirmatively. When an outside apex proprietor is found mining underneath the surface of another's land, he is called upon to justify his presence underneath such surface; and in doing so he must show by a preponderance of evidence that he is following the vein, the apex of which is so situated within the boundaries as to confer an extralateral right to the extent at least of the alleged trespass. This flows from the *prima facie* presumption derived from the common law that he who owns the surface owns everything within its vertical boundaries, and that an outside apex proprietor is called upon to introduce sufficient evidence to rebut that presumption. (*Con. Wyoming* v. *Champion,* 63 Fed. 540, 550; *Leadville M. Co.* v. *Fitzgerald,* 4 Morr. Min. Rep. 380, 389; Fed. Cas. No. 8158; *Heinze* v. *Boston & M. Consol.,* 30 Mont. 484, 77 Pac. 421, 423; *Jones* v. *Prospect Mt. T.*

*Co.*, 21 Nev. 339, 349; *Cheeseman* v. *Hart*, 42 Fed. 98, 105; *Keely* v. *Ophir Hill C. M. Co.*, 169 Fed. 601, 603; *Grand Central M. Co.* v. *Mammoth M. Co.*, 83 Pac. 648, 667.)

*Peck, Bunker & Cole; Cheney, Downer, Price & Hawkins; H. H. Atkinson,* and *Dickson, Ellis, Ellis & Schulder,* for Respondent:

The appeal is without merit, and the decree of the court below should be affirmed.

He who, by his labor and enterprise, brings into circulation the hidden treasures of the earth is entitled to his reward. The wealth which he thus acquires injures no one, but on the contrary promotes the prosperity of all. Hence, it has been the policy of every intelligent nation, in one way or another, to reward those who discover and develop its mineral wealth. (2 Lindley on Mines, sec. 335; *Lawson* v. *United States M. Co.*, 207 U. S. 1, 52 L. Ed. 75.)

Questions of doubtful construction are not to be resolved against one who seeks to pursue his vein extralaterally beneath the surface of his neighbor's territory. (2 Lindley on Mines, secs. 583, 584; 3 Lindley, sec. 866; *Bullion-Beck & Champion M. Co.* v. *Eureka Hill M. Co.*, 5 Utah, 3, 54; *Lawson* v. *United States M. Co.*, 207 U. S. 1, 13; *Empire State-Idaho M. & D. Co.* v. *Bunker Hill S. M. & C. Co.*, 114 Fed. 417.)

The owner is entitled to follow his vein extralaterally between planes, one drawn through the end line, and the other parallel thereto, through the point on the side line where the vein leaves the claim. (*Del Monte M. Co.* v. *New York & L. C. M. Co.*, 66 Fed. 212; *Fitzgerald* v. *Clark*, 42 Pac. 573, 43 L. Ed. 72, 87; *Ajax G. M. Co.* v. *Hilkey*, 72 Pac. 447; *Work M. & M. Co.* v. *Doctor Jack Pot M. Co.*, 194 Fed. 620.)

There is no equity to be subserved by denying the defendant any extralateral right upon the vein, by reason of the course of the west located end line, which is not crossed or touched by any vein in the claim. (*Tyler M. Co.* v. *Sweeney*, 54 Fed. 284.)

The term "terminal edge," as descriptive of the top or apex of a vein, is not found in the act of Congress.   It is true, however, that in a number of cases it will be found that the courts, generally, in instructions to a jury as to what is meant by the top or apex of a vein, have spoken of it as the "terminal edge thereof" or "where the vein is found at or nearest the surface as it is followed in its upward course."   In other cases the top or apex has been defined as "the highest or terminal point of the vein" or "where it approaches nearest the surface of the earth and where it is broken on its edge so as to appear to be the beginning or end of the vein."   Such expressions or definitions of top or apex, as used in the act, are altogether apt and free from criticism as applied to the vast majority of veins or lodes, for, with rare exceptions, veins are found to occupy a position in the mass of the mountain between the horizontal and the vertical, as though standing on edge, and of course the top or apex of every such vein would present the appearance of a terminal edge, as though it were the end or the beginning of the vein.   The rule is fundamental that any language found or expression used in a decision of any court is to be read, understood, and applied in the light of the facts of the particular case with which the court is dealing. (*Cohen* v. *Virginia*, 6 Wheat. 399; *Parsons* v. *District of Columbia*, 107 U. S. 45; *Ogden* v. *Saunders*, 12 Wheat. 198; *French* v. *Barber Asphalt P. Co.*, 45 L. Ed. 898; *Hans* v. *Louisiana*, 134 U. S. 1, 20; *Leisy* v. *Harden*, 135 U. S. 100, 134; *Northern Bank* v. *Porter Township*, 110 U. S. 608, 615; *Fidelity Trust Co.* v. *Gill Car Co.*, 25 Fed. 737, 748; *Southern Railway Co.* v. *Simpson*, 131 Fed. 705, 709; *St. Louis L. M. & S. Ry. Co.* v. *Davis*, 132 Fed. 629, 635; *Mayor* v. *Erhardt*, 88 Ill. 452, 457; *In Re Johnson*, 98 Cal. 531; *Ex Parte Young Ah Gow*, 73 Cal. 438; *Hart* v. *Burnett*, 15 Cal. 530.)

No court has been called upon to determine or define what, within the meaning of the act, is to be regarded as the top or apex of a vein or lode, having the form of a single anticlinal fold.   Such a deposit is a vein or lode

within the meaning of the act of Congress. (*Stevens* v. *Williams*, 23 Fed. Cas. No. 13414; *Hyman* v. *Wheeler*, 39 Fed. 347, 355; *Iron Silver M. Co.* v. *Cheesman*, 116 U. S. 529, 535; *Duggan* v. *Davey*, 26 N. W. 887; *Book* v. *Justice Mining Co.*, 58 Fed. 106, 121.)

The word "top," as used in the act of Congress, is to be understood in its popular sense. (*Duggan* v. *Davey*, *supra; Stevens* v. *Williams*, 1 Morrison's M. Rep. 557, 561; Sutherland, Stat. Constr., secs. 250, 257; *Brewer* v. *Harris*, 5 Gratt. 298; *Gross* v. *Fowler*, 21 Cal. 393; *Corning* v. *Board*, 102 Fed. 57; *In Re Ellis*, 179 Fed. 1002; *U. S.* v. *Chesebrough*, 176 Fed. 778, 781.)

Where any particular feature or characteristic of a given vein is found to be persistent throughout extensive development, the presumption will be indulged that this feature or characteristic exists in the undeveloped portion. (Lindley on Mines, sec. 615, p. 1474.)

By the Court, NORCROSS, C. J., after stating the facts as above:

This case presents two main questions of law, to wit:

First—Whether the fact that the westerly end line of the surface area of the West End claim as patented, being not a straight, but a broken, line, in and of itself deprives the owner of that claim of extralateral rights upon any vein apexing therein.

Second—Whether, within the meaning of the act of Congress, the crest or crown of a vein which is found in the form of a single anticline may be regarded as the top or apex of the vein, and extralateral rights exist upon such vein in opposite directions.

The answer to these questions must be found in an interpretation of that portion of the mining act which contains the grant of extralateral rights, and which reads as follows:

"The locators of all mining locations * * * shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface

lines extended downward vertically, although such veins, lodes, or ledges may so far depart from a perpendicular in their course downward as to extend outside the vertical side lines of such surface locations. But their right of possession to such outside parts of such veins or ledges shall be confined to such portions thereof as lie between vertical planes drawn downward as above described, through the end lines of their locations, so continued in their own direction that such planes will intersect such exterior parts of such veins or ledges. And nothing in this section shall authorize the locator or possessor of a vein or lode which extends in its downward course beyond the vertical lines of his claim to enter upon the surface of a claim owned or possessed by another." (Section 2322, U. S. Rev. Stats.; U. S. Comp. Stats. 1913, sec. 4618.)

The following diagram shows the relative position of the surface boundaries of the patented West End location:

**1.** The location would embrace a full claim 1,500 feet by 600 feet, excepting for the excluded area embraced within the two triangles 3, 3a, 4, and 7, 7a, 8. The lines 4, 5, and 1, 8, are parallel. While the plat and field notes, accompanying application for the patent, are not in the record, it is probable that they would disclose that the surface boundaries of the claim as located would include the two triangular pieces of ground above mentioned, and that the same were excluded from the patent application because in conflict with prior existing locations. In every great mining district locations are made from time to time in every direction, and a map of such a district presents a confusing mass of conflicting boundaries. In locating a claim the locator may lay his lines upon or across portions of prior existing claims in order to secure parallelism of end lines, and thus secure to himself extralateral rights. (*Del Monte Case*, 171 U. S. 55, 18 Sup. Ct. 895, 43 L. Ed. 72.)

While a locator, prior to patent as well as after patent, may have no greater extent of extralateral rights than the extent of the vein within the boundaries of his surface rights (2 Lindley, sec. 574), he may, prior to patent, have his extralateral rights determined by planes parallel to planes passing through his located end lines, even though one or both of such located end lines are upon the surface ground of contiguous prior claims owned by other parties. This is the rule of the Del Monte and other cases. What reason, then, can exist in support of a proposition that because such owner obtained a patent for his claim he must forfeit extralateral rights because in his application for patent he excludes areas in conflict with prior claims, resulting in patented surface boundaries of irregular shape. There is, it seems to us, no reason why such a thing should be. Certainly the securing of a patent to a location ought not to leave a locator with less rights than he had before. That the mining laws are to be liberally construed in favor of the locator is a proposition now too well settled to need a citation of authorities. To hold that, simply because the boundaries of the surface of a

patented claim are so irregular in shape as not to present parallel end lines, due to exclusions of conflict, extralateral rights are lost, is to place upon the statute a construction contrary to its purpose, as that purpose has frequently been enunciated. (*Lawson* v. *U. S. M. Co.*, 207 U. S. 1, 28 Sup. Ct. 15, 52 L. Ed. 65; 2 Lindley, sec. 584.)

Even if this is a more liberal construction of the statute than is warranted, which we think it is not, nevertheless, so far as this particular case is concerned, it cannot, we think, be said that the patented surface area of the West End claim does not present parallel end lines. The end lines 1, 8, and 4, 5, are each part of the original located end lines. They should, we think, still be considered end lines, and the true end lines of the patented claim. To so hold requires that the line 3, 4, be regarded as a side line rather than as a part of a so-called broken end line. We think it should be so regarded. Side lines are not required to be parallel. No rule can well be applied governing courses and distances of side lines other than that they shall not be so laid as to increase the statutory width or length of a claim. The line 1, 8, is conceded to be an end line. But if the line 4, 5, is not also an end line, but rather a part of a broken end line, it is drawing a rather fine distinction to say that the lines 3, 4, and 4, 5, are parts of a broken end line, and that the lines 7, 8, and 8, 1, are not. The difference is only in the degree of the angle and the length of the lines—a difference which has no reasonable basis upon which to support a distinction. We think that the ruling that the line 4, 5, is the westerly end line of the West End claim finds support in both reason and authority. (*Walrath* v. *Champion M. Co.*, 171 U. S. 293, 18 Sup. Ct. 909, 43 L. Ed. 170.)

2. We come now to a consideration of the question whether extralateral rights exist upon a vein in the form of a single anticlinal fold. It is the contention of counsel for appellant that such rights do not exist, for the reason, among others alleged, that the federal statute does not contemplate extralateral rights in opposite directions. It is the contention that only veins dipping in the same direction as the discovery vein may be followed

extralaterally; that where within the same location a secondary vein is found dipping in the opposite direction as that of the discovery vein, extralateral rights thereon cannot be enjoyed. We think the statute is not susceptible of this construction. The statute gives to the locators "the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes, and ledges throughout their entire depth, the top or apex of which lies inside of such surface lines, * * * although such veins, lodes, or ledges may so far depart from the perpendicular in their course as to extend outside the vertical side lines of such surface locations."

Congress manifestly contemplated that the locator of a mining claim might discover more than one vein within his surface boundaries, and provided that he should have "all veins, lodes and ledges, throughout their entire depth." But it is contended that the concluding portion of the section, limiting extralateral rights between "vertical planes drawn downward * * * through the end lines * * * so continued in their own direction" negatives an intent to permit extralateral rights in opposite directions, because the words "in their own direction" relate to but one direction, that of the dip of the discovery vein. We are unable to see the force of this contention. The direction of an end line depends upon which end of the line it is viewed from. The courses given in a patent of the two end lines of a claim usually, and doubtless invariably, are in opposite directions. It would be a strained construction, and one, we think, not within the letter or spirit of the statute, to hold that end lines may be considered as having but one direction. If a vein in the form of a single anticlinal fold may be said to have an apex, we think there is nothing in the statute which militates against extralateral rights upon such vein in opposite directions, the same as though it were two veins with separate apices, instead of one vein.

**3.** The most serious question presented in this case is whether the vein in question may be said to have an

apex.   The vein is in the form of a single anticlinal fold, and the precise question presented by a vein in such form appears never, heretofore, to have been determined. Counsel for appellant, in their brief, say:

*a*

*b*

*c*

"The definition of the term 'apex' as employed in the mining statute involves the elements of terminal edge of a vein and downward course extending therefrom. According to this definition, the horizontal sheet 'a' on figure 3 here inserted and the anticlinal fold 'b' have no apices, while the synclinal fold 'c' has two apices. * * * "
[See page 393.]

It is apparent that no extralateral rights could attach to a horizontal vein, as represented in sheet "a," because such vein has no "course downward" as prescribed in the statute. Such a vein has a top, if not an apex, in the strict sense of that word, and will support a valid location. Why a synclinal fold should be said to have two apices and an anticlinal fold have none is not so easy to find a reason for, unless we accept as conclusive appellant's contention that a terminal edge is essential to a true definition of the word "apex" as used in the statute. The words "terminal edge" are not used in the statute, nor have they been of universal use in defining an apex. The great majority of veins have terminal edges, and in all such cases the apex of the vein is its terminal edge. If veins in the form of a single anticlinal roll were the rule rather than the rare exception, we are of the opinion that a contention that a terminal edge was essential to an apex would be as rare as the character of the vein now in question. It has been repeatedly said by courts and text-writers that the words "top" and "apex" were not a part of the miner's terminology prior to the adoption of the federal mining statutes. They were words used by legislators to convey the intent of the framers of the statute. There is no controversy regarding the general purpose and intent of the mining statutes. The government as a matter of public policy was interested in the development of the mining resources of the nation. It offered to the prospector and miner the most liberal reward for his enterprise in discovering and developing the hidden treasures of the earth. It gave him the exclusive possession of the surface of every valid location made, placed no limit upon the number of such locations; gave

him all veins, lodes, and ledges throughout their entire depth, the top or apex of which were within his surface lines.  It exacted no price for the land as a condition precedent to mining operations, and placed no restrictions upon him that were not consistent with the public purpose, such as requiring a minimum of annual labor as an evidence of good faith.  To say that a miner fortunate enough to discover a valuable vein in the form of a single anticline shall not have extralateral rights upon each limb of his vein because, forsooth, the summit or crest of the anticlinal fold does not present a terminal edge, as is the case of the ordinary form of a fissure vein, in our opinion would do violence to the spirit, if not the very letter of the statute.  The well-settled policy of the courts is to construe the statutes liberally in the interest of the miner.  It has been determined that if the locator by inadvertence places his location crosswise instead of lengthwise of his vein, he does not lose his extralateral rights, but his side lines will be regarded as end lines, and vice versa.  So, too, if his vein crosses an end and a side line, he will be given a new side line for purposes of determining the extent of his extralateral rights.  So, too, in the matter of discovery, the first essential to a valid location, the extreme liberality of the courts has been manifested in hundreds of cases.

If a locator finds his surface boundaries embrace the apices of two or more valuable veins, he is simply fortunate the same as the locator whose single ledge is more valuable than the one of his neighbor.  The statute makes no distinction between rights of locators based upon the value of the discoveries.  Such distinctions are not within the policy of the statute.  The only difference between a vein in the form of a single anticlinal fold and the ordinary fissure vein is that the former has a crest, the limbs of which dip in opposite directions, while the latter has a terminal edge and a dip in but one direction.  But this distinction presents no difference such as would violate the purpose of the statute if the crest of the former, like the terminal edge of the latter, should be

held to constitute an apex. The distinguished counsel for appellant, in his great work on Mines, says:

"In the light of the rules announced in the previous articles, if a given mineral deposit is in place, it is a lode. The law assumes that the lode has a top, or apex, and provides for the acquisition of title by location upon this apex. A lode without an apex is not contemplated, and no provision is made for locating it. It cannot be located under the placer laws, because these laws apply only to deposits not in place, and before it can be legally located as a lode, the apex, or top, must be found. If a location is made on the side or on the dip, whoever discovers and properly locates the apex will be entitled to enjoy the full rights accorded to regular valid lode locations, and the rights of those who have located on the side edge, or dip, must yield. The most serious difficulty in defining the apex has arisen in connection with certain flat, or 'blanket,' deposits, which have been judicially determined to be lodes within the meaning of the statutes. It is often quite impracticable to fix upon any exposure of such a deposit which properly constitutes the apex. It is true that after a lode patent is issued, the existence of an apex within the patented ground will be conclusively presumed, but not necessarily the apex of the vein in dispute. Nor will it be conclusively presumed that any particular exposure of the vein is that apex. It must still remain a question of proof." (Lindley on Mines, vol. 1, 3d ed. sec. 305.)

Can it be said with reason that a vein in the form of a single anticlinal fold was not intended to be the subject of a location within the meaning of the mining statutes because it does not possess a terminal edge? It is conceded that it is a vein or lode, and it is well settled that it is one. "All valuable mineral deposits * * * are * * * free and open to exploration and purchase" is the language of the statute. (Rev. Stats. U. S. sec. 2319; U. S. Comp. Stats. 1913, sec. 4614.) The federal statutes clearly contemplated that the vein in question was subject to location, for it made no exclusions of veins of any

particular character.  If a vein without an apex is not contemplated, and no provisions made for locating it, as the distinguished author says, then it follows as a necessary conclusion that the vein in controversy has an apex. If it has an apex, there is no other possible place for it to be than at the crest of the anticlinal fold.

It is contended, however, that the Supreme Court of the United States is committed to the view that a terminal edge is essential to an apex of a vein or lode, and the recent case of *Stewart Mining Company* v. *Ontario Mining Company,* 237 U. S. 350, 35 Sup. Ct. 610, 59 L. Ed. 989, is cited in support of this contention.  In that case, Mr. Justice McKenna, speaking for the court, said:

"An apex is, on cited authority, defined to be 'all that portion of the terminal edge of a vein from which the vein has extension downward in the direction of the dip.'  And it is further said that the definition has been approved in Lindley on Mines, because, as therein expressed, it 'involves the elements of terminal edge, and downward course therefrom.'  We may accept the definition.  In its application, however, it immediately encounters a question of fact—the locality of the terminal edge; and in this case the state courts did not find it to be where plaintiff asserted it to be."

The court in the Stewart-Ontario case did "accept the definition" of apex to be the terminal edge of the vein. The vein in controversy in that case had a terminal edge, and there was no occasion to consider whether the definition given was comprehensive.  The Idaho court, from which the case was reviewed, on error, had determined that that which the Stewart Company claimed was an apex was only the side of the vein where the vein on its strike was cut off by a fault.  The Idaho court was sustained.  (See same case, 23 Idaho, 724, 132 Pac. 787, and *Stewart M. Co.* v. *Bourne,* 218 Fed. 327, 134 C. C. A. 123.)

As said by Chief Justice Marshall in the celebrated case of *Cohens* v. *Virginia,* 6 Wheat. at page 399, 5 L. Ed. 257:

"It is maxim, not to be disregarded, that general

expressions, in every opinion, are to be taken in connection
with the case in which those expressions are used. If
they go beyond the case, they may be respected, but
ought not to control the judgment in a subsequent suit,
when the very point is presented for decision. The reason
of this maxim is obvious. The question actually before
the court is investigated with care, and considered in its
full extent. Other principles which may serve to illustrate
it are considered in their relation to the case decided,
but their possible bearing on all other cases is seldom
completely investigated."

This maxim has been reiterated times almost without
number. It is applicable to the Stewart-Ontario decision.
The definition was sufficient for the question involved in
that case; otherwise we may assume the question would
have been given more consideration than the laconic sen-
tence, "We may accept the definition." Judge Hawley, in
*Book* v. *Justice Mining Co.*, 58 Fed. (C.C.) at page 121,
in reference to the definition of a vein or lode, said:

"Various courts have at different times given a defi-
nition of what constitutes a vein, or lode, within the
meaning of the act of Congress; but the definitions that
have been given, as a general rule, apply to the peculiar
character and formation of the ore deposits, or vein
matter," etc.

The Idaho court, in the Stewart-Ontario case, *supra*, at
page 737 of 23 Idaho, page 792 of 132 Pac., speaks of the
definition of the word "apex" as follows:

"The definitions of the word 'apex' as used in the statute
(section 2322, U. S. Rev. Stats.) all reach the one inevi-
table conclusion that it is the highest point in the vein
(*Flagstaff Silver M. Co.* v. *Tarbet*, 98 U. S. 469, 25 L. Ed.
253; 9 Morr. Min. Rep. 607; Lindley on Mines, 2d ed. secs.
305, 309; Costigan on Mining Laws, p. 137, sec. 35; *Dug-
gan* v. *Davey*, 4 Dak. 110, 26 N. W. 887; 17 Morr. Min. Rep.
59; *Del Monte M. Co.* v. *Last Chance M. Co.*, 171 U. S. 55,
18 Sup. Ct. 895, 43 L. Ed. 72; 19 Morr. Min. Rep. 370), but
this is only a general definition, and its application to any
particular vein or peculiar location may, and often will,

call for further particularity of description. It must be the top or terminal edge of the vein on the surface or the nearest point to the surface, and it must be the top of the vein proper rather than of a spur or feeder, just as the highest point in the roof of a house would be taken to be the apex of the house, and not the chimney or flagstaff. Again, an apex is a point from which the vein has a dip, as well as strike, or course, else it confers no extralateral right."

Where a vein has a terminal edge its apex is a point from which, or a line along which, is its strike, and from which it has a dip, but this is equally true of the crest of a vein in the form of a single anticlinal fold. Counsel for appellant quote the following definitions from text-writers in support of the terminal edge theory:

"Conceiving a vein or lode to be an intrusive sheet of mineralized matter of varying thickness found in the mass of the mountain, the apex of a vein is thus seen to be that edge of the sheet which shows on the surface of the location, or is nearest to the surface. It is not a point, though apex naturally suggests point. It is not a line, though it has the full extension of the upper edge of the lode. It is the whole surface of the upper edge of the vein, with all the width and length which that edge has." (Costigan on Mining Laws, 139, 140.)

"The mere fact of proximity to the surface is insufficient to establish the apex without the evidence that it is the upper edge or end of the vein." (Barringer and Adams, The Law of Mines and Mining, p. 442.)

"In the mathematical sense, an apex means the highest point; but it is not used in this sense in the statute. As used therein, it means the edge or termination of the vein which comes to the surface of the earth, forming an outcrop, or which comes nearest to the surface of the earth when the vein terminates before it reaches the surface. * * * It may not be the highest point of a vein, as such highest point may be found in a swell of the vein." (Shamel, Mining, Mineral and Geological Law, 193, 197.)

"The top or apex of a vein or lode is the highest point thereof, and may be at the surface of the ground or at any point below the surface; the end or edge of a vein nearest the surface." (Mines and Minerals, 27 Cyc. 537.)

"The end or edge of a vein nearest the surface." (Raymond, Glossary of Mining and Metallurgical Terms, Trans. Am. Inst. M. E. vol. 9. p. 102.)

It is quite manifest, we think, that all the definitions quoted are considering the ordinary form of vein. Definitions given by text-writers are usually based on court decisions, and like such decisions are to be considered with reference to the facts upon which they are based. From section 306 of Lindley on Mines, we quote:

"Webster defines an apex to be 'the top, point, or summit of anything.' Compilers of dictionaries which have made their appearance since the act under consideration was passed have not been particularly lucid in their definitions. For instance: Standard Dictionary: '(1) The pointed or angular end, or highest point, as of a pyramid, spire, or mountain; extreme point; tip; top. (2) The vertex of a plane or solid angle. (3) The highest point of a stratum, as a coal seam.' Century Dictionary: '(1) The tip, point, or summit of anything. In geometry, the angular point of a cone or conic section. The angular point of a triangle opposite the base. (2) In geology, the top of an anticlinal fold of strata. This term, as used in United States Revised Statutes, has been the occasion of much litigation. It is supposed to mean something nearly equivalent to outcrop; but precisely in what it differs from outcrop has not been, neither does it seem capable of being, distinctly made out.' Evidently the courts even now can receive but little assistance from the lexicographers."

It appears, however, that the Century Dictionary, in an effort to give a comprehensive definition regards "the top of an anticlinal fold of strata" as an apex. Counsel for appellant, in their brief, say:

"Probably the most interesting and instructive of all the adjudicated cases is the pioneer case of *Duggan* v.

*Davey*, 4 Dak. 110, 26 N. W. 887.    The decision of the
Supreme Court of Dakota follows, in the main, the opinion
given by the trial court.    It is a lucid and masterly pre-
sentation of the law; and, while an anticlinal roll was not
there involved, several expressions of the court are well
worth quoting in support of our contention that a ter-
minal end or edge of a vein is an essential element of
apex definition.    'The definition of the top or apex of a
vein usually given is "the end, or edge, of a vein nearest
the surface."   *   *   *   Justice Goddard, a jurist of
experience in mining law, in his charge to the jury in the
case of *Iron Silver* v. *Louisville*, defines "top or apex"
as the highest, or terminal, point of a vein "where it
approaches nearest the surface of the earth, and where
it is broken on its edge, so as to appear to be the beginning
or end of the vein."   *   *   *   ' "

Some expressions of the court used just prior to the
language last quoted are instructive:

"The definition of the top, or apex, of a vein usually
given is, 'The end, or edge, of a vein nearest the surface,'
and to this definition the defendants insist we must adhere
with absolutely literal and exclusive strictness, so that
wherever, under any circumstances, an edge of a vein
can be found at any surface, regardless of all other
circumstances that is to be considered as the top or apex
of the vein.   *   *   *   The definition given is, no doubt,
correct under most circumstances, but, like many other
definitions, is found to lack fullness and accuracy in
special cases; and I do not think important questions of
law are to be determined by a slavish adherence to this
letter of an arbitrary definition.   It is indeed difficult to
see how any serious question could have arisen as to the
practical meaning of the terms 'top' or 'apex,' but it
seems in fact to have become somewhat clouded.    I
apprehend if any intelligent person were asked to point
out the top, or apex, of a house, a spire, a tree, or hill, he
would have no difficulty in doing so, and I do not see why
the same common sense should not be applied to a vein or
lode."

In the *Duggan* v. *Davey* case, the question was whether an exposed side of a vein, caused by erosion or some other agency, upon which locations were made, constituted the apex of the vein. The question was substantially the same as that involved in the Stewart-Ontario case, *supra*. The same contention appears to have been made in this case, based upon the fact that the westerly portion of the vein within the West End claim, by some titanic eruption of the earth's surface, had been cut off, leaving a sharply defined, but irregular, broken edge.

The case of *Illinois S. M. Co.* v. *Raff*, 7 N. M. 336, 34 Pac. 544, is cited by counsel for appellant as "a case possessing many points of similarity to the case at bar." In that case the court said:

"We can recognize the definition of a vein as given by Judge Hallett in *Hyman* v. *Wheeler*, 15 Mor. 519, and still see that the jury in this cause might from the evidence have determined that here was a vast bed, lode, zone, or mass of mineral-bearing lime, with no footwall and, in some localities, with no hanging wall or even cap, in others covered with shale, the lime body extending throughout the Illinois, the Calamity, the Andy Johnson, Brush Heap, and locations west and south of the Illinois, as well as possibly other mines. That this body or mass, zone, or lode of lime was broken or cut up into fissures, gashes, pockets, veins, etc., and these spaces filled with mineral * * *; in fact, we might accept either of the theories advanced by geologists and mineralogists as to the formation of the rock or deposit of mineral, and there yet would be nothing to prevent our reconciling that theory with the verdict of the jury in this cause, that there was neither a vein nor an apex upon the Illinois mine, or at least such a vein as could be followed beyond the side lines of that claim. There may be a contact, and yet no contact vein. The mineral may be exposed at a point upon one claim and followed continuously under the surface from this point to another property, though an undisputed vein between clearly defined hanging and footwalls, and still the point at which mineral is exposed

not be the apex of the vein which may have an apex ten miles distant, or may have no apex at all.   *   *   *   The zone or mass may follow the undulations of a broken country down into the valley, and rising over the divides, cutting through, covered by, or overlapping, other formations, but until it is broken and the edges exposed or some edge or end as a beginning point found from which it can be followed down at some angle below the horizontal, there is no apex from which it can be followed beyond the side lines of a claim located upon it."

The facts before the New Mexico court were so different from those of the case at bar that we think the case affords little aid in determining the question here.

Our attention has been directed to definitions of the word "apex," given in instructions to juries by Judge Hallett in the case of *Iron Silver M. Co.* v. *Murphy* (D. C.) 3 Fed. 368, and by Justice Miller in the case of *Stevens* v. *Williams*, Fed. Cas. No. 13413, both cases growing out of the peculiarities of the Leadville ore deposits. Referring to the character of these ore deposits, Lindley, at section 300, says:

"The blanket deposits at and in the vicinity of Leadville, Colo., have given rise to most of the controverted questions on the subject of 'lodes,' 'veins,' 'inplace,' 'top,' and 'apex'; and the burden of solving many of these difficulties in the first instance fell to the lot of Judge Hallett.   His decisions have furnished the text for other courts, in other jurisdictions, where analogous conditions have been, to a limited extent, encountered."

Again, in section 311, the author says:

"As in almost all other phases of the mining law, the flat deposits of Leadville have produced their full quota of adjudicated law on the subject of 'tops' and 'apices.'   As these deposits are legally held to be veins, or lodes, of rock in place, subject to mineral location, the law contemplated that they should have apices."

The section includes a number of figures illustrative of the Leadville formation, none of which present any similarity to the vein in controversy here.   Justice Miller

instructed the jury relative to the facts in the Stevens case, *supra*, among other matters as follows:

"The top or the apex of a vein, within the meaning of the act of Congress, is the highest point of that vein where it approaches nearest to the surface of the earth, and where it is broken on its edge so as to appear to be the beginning or end of the vein. The word 'outcrop' has been used in connection with it. * * * It means the nearest point at which it is found toward the surface of the earth. And where it ceases to continue in the direction of the surface is the top or apex of that vein. It is said in this case that the point claimed to be the top or apex is not such, because at the points where plaintiff shows, or attempts to prove, an interruption of that vein, in its ascent towards the surface, and what he calls the beginning of it, the defendants say that is only a wave or roll of the general shoot of the metal, and that from that point it turns over and pursues its course downwards as a part of the same vein, in a westerly or southwesterly direction. It is proper, I should say to you, if the defendants' hypothesis be true, if that point which the plaintiff calls the 'highest point,' the 'apex' is merely a swell in the mineral matter, and that it turns over and goes on down in a declination to the west, that it is not a true apex within the statute. It does not mean merely the highest point in a continuous succession of rolls or waves in the elevation and depression of the mineral nearly horizontal."

We have here a very different state of facts than were involved in the Leadville cases. In those cases the court was dealing with a mineral formation nearly horizontal or varied by a series of anticlinal and synclinal rolls. Here we have a vein in the form of a single anticline.

The land commission created by act of Congress of March 3, 1879, c. 182, 20 Stat. 394, sought and obtained, among other matters, many definitions of the word "apex" as used in the mining statutes. Many of these definitions are embodied in section 307 of Lindley. Relative to these definitions the author says:

"Judge Beatty, then Chief Justice of Nevada, gave the clearest and most comprehensive of all the definitions. It is as follows: 'The top, or apex, of any part of a vein is found by following the line of its dip up to the highest point at which vein matter exists in the fissure.' According to this definition, the top, or apex, of a vein is the highest part of the vein along its entire course. If the vein is supposed to be divided into sections by vertical planes at right angles to its strike, the top, or apex, of each section is the highest part of the vein between the planes that bound that section. * * * Of course, there are irregular mineral deposits departing widely in their characteristics from the typical or ideal vein which seems to have been in the mind of the framer of the act of 1872. To such deposits the foregoing definitions will not apply; and, in my opinion, great difficulty will be experienced in any attempt to apply the existing law to them."

If we apply the definition of Judge Beatty to the vein here involved, and follow the line of the dip of either or both limbs of the anticline to the highest point, we come to the crest. There is nothing in this definition which militates against the crest of the anticlinal roll being the apex of the vein, unless it is assumed or conceded that a vein can have but a dip in one direction.

There can be, and there is, no question in this case but that the so-called West End-McNamara vein was subject to location. If it be true, and we assume that it is, that the law contemplates that every vein has an apex (Lindley, secs. 305, 311), then it necessarily follows, we think, that the crest of the anticlinal roll is the apex: Certainly by no process of reasoning can it be said that the apex lies in either Jim Butler or McNamara ground, except as the crest of the anticline may be in McNamara territory after it crosses the northerly side line of the West End claim.

The judgment is affirmed.

[NOTE—On writ of error to United States Supreme Court.]